STATE OF LOUISIANA IN THE INTEREST OF B. F., B. F., B. F.

C/W

STATE OF LOUISIANA IN THE INTEREST OF B. L.

NO. 19-CA-115

C/W

19-C-144

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE JEFFERSON PARISH JUVENILE COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 2011-CC-119, DIVISION "B"
HONORABLE ANDREA PRICE JANZEN, JUDGE PRESIDING

August 09, 2019

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Robert A. Chaisson

<u>**AFFIRMED; WRIT DENIED**</u>

    **JGG**
    **FHW**
    **RAC**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA, DEPARTMENT OF CHILDREN AND FAMILY
SERVICES
 Elizabeth G. Lincoln

COUNSEL FOR PARENT/APPELLEE,
R. L., III, FATHER
 Lisa P. Harell

COUNSEL FOR DEFENDANT/APPELLANT,
R. L., JR. AND L. L., GRANDPARENTS
 Kristine K. Sims

**GRAVOIS, J.**

In this child in need of care proceeding, appellants, L.L. and R.L., Jr.,[1] the paternal biological grandparents of the subject child, the infant B.F.,[2] appeal the judgment of the Jefferson Parish Juvenile Court at the placement hearing held on November 27, 2018.  In their limited intervention into this proceeding, appellants sought custody of B.F.  The placement hearing judgment under review maintained custody of B.F. in her foster parents, subject to conditional visitation privileges in favor of appellants.  The judgment also resulted in a stay of appellants' intervention as to all matters other than their visitation privileges.

After they filed their appeal, on February 5, 2019, appellants filed in the Juvenile Court "expedited" motions to lift the stay of their intervention, for fixed and unsupervised visitation, and for immediate implementation of a transition plan. On February 20, 2019, the Juvenile Court judge granted a hearing on the issue of visitation, but summarily denied appellants' motions to lift the stay of their intervention and for immediate implementation of a transition plan.  In response, on March 26, 2019, appellants filed a writ application with this Court, Docket No. 19-C-144, seeking supervisory review of the Juvenile Court judge's denial of their motions to lift the stay of their intervention and for immediate implementation of a transition plan.  Because of common parties and interrelated facts and issues, the writ application has been consolidated with this appeal for decision.

For the following reasons, we affirm the November 27, 2018 judgment of the Juvenile Court,[3] and deny the writ application.

---

[1] Pursuant to Uniform Rules–Courts of Appeal, Rules 5-1 and 5-2, the initials of the parties are used herein to protect and maintain the privacy of the minor child involved in this proceeding.  *See also L.R.F. v. A.A.*, 13-797 (La. App. 5 Cir. 2/26/14), 133 So.3d 716, 717 n. 2.

[2] The child at the center of this appeal is referred to in the record alternatively as "B.F.", with F. being her mother's maiden name, and "B.L.", with L. being her father's last name.  For simplicity, we shall refer herein to the child as "B.F." because the caption of the suit uses these initials.  The other children listed in the caption of this matter, B.F. and B.F., are older maternal half-brothers of B.F. who are not the subject of this appeal.

[3] It is noted that R.L., III, appellants' son, also filed a brief with this Court in support of appellants.  R.L., III is not a party to his parents' intervention and thus is not an appellant to the judgment on review herein. Accordingly, we shall not consider the assignments of error contained in R.L., III's brief.

## FACTS AND PROCEDURAL HISTORY

B.F. (the subject child) was born drug exposed to R.F. on November 22, 2017, whereupon she was immediately taken into custody of the State through the Department of Child and Family Services ("DCFS") by instanter order. The State thereafter immediately initiated this child in need of care proceeding. R.F. and R.L., III, appellants' son, were married in February of 2017 and were still married at the time of B.F.'s birth, although they apparently have since divorced. The record reflects that like R.F., R.L., III has a lengthy substance abuse history.[4] The couple lived at appellants' home in a garage apartment at points prior to the birth of B.F. and when B.F. was born, but after B.F.'s birth, R.F. returned for only a short period of time and then appellants required her to leave their home due to ongoing conflicts with her husband, R.L., III. R.F. moved elsewhere and the couple separated. According to testimony in the record, appellants were approached by DCFS soon after B.F. was born to see if they were interested in custody of B.F., but they declined at that time, in part because R.L., III expressed doubt, after B.F.'s birth, that she was his child, as well as for other reasons.[5] Because no other relatives were either identified as suitable placements or expressed interest in placement, B.F. was placed with foster parents on December 11, 2017, after she was discharged from the neonatal intensive care unit, where she has since resided.[6]

---

[4] Additionally, the record indicates that in 2008, R.L., III suffered a traumatic brain injury, which prevents him from gainful employment and for which he receives disability benefits.

[5] Case officer Erin Luquette with DCFS testified at the permanency hearing on November 27, 2018 that while B.F. was still in the neonatal intensive care unit, a worker with child protection investigations visited appellants' home (which was also where R.L., III resided at that time), and while there, asked about possible placement of B.F. with appellants. She testified that only R.L., Jr. was at home at the time and that "[w]hen I actually received the case as a foster care worker, it had been addressed with [appellants]. They said no, … ."

R.L., Jr. testified at the intervention hearing on August 7, 2018 that he declined placement at that time because they weren't sure about paternity, specifically stating that "we didn't know if it [B.F.] was his [R.L., III's]" and because "after that we didn't - - I didn't want to have to deal with [R.F.]" They also felt that they wanted R.L., III "to do what he needed to do to get himself straight and the situation where he can take his baby - - get his baby." He further testified that "we're getting kind of old to be taking care of, you know, an infant till its college years. We kind of wanted to relax and enjoy ourselves. …"

[6] Upon being placed in the custody of DCFS, B.F. and her parents began receiving services from the Tulane Parent Education Program ("T-PEP"), who provides parent education services for DCFS.

On February 6, 2018, at an answer hearing on the petition for the child in need of care proceeding, R.F. and R.L., III both stipulated that B.F. was in need of care without admitting the allegations of the petition. At an Adoption and Safe Families Act ("ASFA")[7] dispositional hearing on March 13, 2018, R.F. and R.L., III were each given case plans with stated goals of reunification. The case plans required, among other things, that R.F. and R.L., III each remain drug-free, complete substance abuse treatment, and maintain clean and safe housing.

DNA test results filed into the Juvenile Court record on March 5, 2018 established that B.F. was indeed R.L., III's biological daughter. These DNA test results were delivered to R.L., III at appellants' home, where he resided at the time, shortly before this date, around February 26, 2018. Following confirmation of paternity, appellants provided their son with some assistance in meeting his case plan goals, including transporting R.L., III to supervised visitation with B.F. at the DCFS office.

In late May of 2018, appellants told the DCFS caseworker that they were interested in custody of B.F. On June 22, 2018, appellants filed in the Juvenile Court proceeding a pleading entitled "Paternal Grandparents' Motion to Intervene, Motion for Immediate Family Placement, and Request for Notice of Proceedings Pursuant to La. Ch.C. Art. 623A." On June 25, 2018, the Juvenile Court judge summarily denied appellants' motions pursuant to La. Ch.C. art. 697.[8] Appellants

---

[7]ASFA, 42 U.S.C. § 601, *et seq.*, passed by Congress in 1997, requires states, as a condition to continued receipt of certain federal funding, to enact parallel legislation. ASFA is intended to make four principal reforms: (1) that the safety of children is paramount in custody decision making; (2) that foster care is temporary and that agency and judicial decision making must be expedited in order to optimize the child's needs for a stable and permanent home; (3) that the state's duty to make "reasonable efforts" to reunify a family is subordinate to legitimate concerns about the child's health and safety; and (4) that states will be held accountable for their efforts to reduce the number of children who are stranded in the foster care system. *State ex rel. SNW v. Mitchell*, 01-2128 (La. 11/28/01), 800 So.2d 809, 815, quoting La. Ch.C. art. 601, Official Comment (b).

[8] Article 697 of the Louisiana Children's Code provides:

    A.  For good cause shown, the court or administrative review body may allow any interested person, agency, or organization to intervene in the case review proceedings to facilitate the permanent placement of the child and to insure that the best interests of the child are protected.

    B.  Upon motion of a party and for good cause shown, the court or administrative review body may limit the nature and extent of intervener's participation in the case review hearing.

sought this Court's supervisory review of that ruling. On July 25, 2018, upon review of the writ application, this Court found that the Juvenile Court judge erred in summarily denying appellants' motion to intervene without conducting a full hearing to consider the best interest of the child as per La. Ch.C. art. 697.[9] Upon remand and a hearing on August 7, 2018, the Juvenile Court judge granted appellants a limited intervention. The minute entry reflecting this ruling indicates that the Juvenile Court judge maintained custody of B.F. with DCFS and placement with the foster parents, ordered increased visitation between B.F. and appellants, and ordered that DCFS set up an assessment at Tulane Parent Education Program ("T-PEP") for appellants to address their parenting abilities and to determine what if any attachment B.F. had with appellants, and if T-PEP deemed appellants an appropriate placement, then T-PEP and DCFS were ordered to develop a transition plan for B.F.

Following the grant of the limited intervention, appellants participated in at least seven supervised visits with B.F. at the DCFS office, which were observed by DCFS and T-PEP clinicians. R.L., III also attended several of these supervised visits, as well as B.F.'s foster mother at the specific request of T-PEP and the DCFS caseworker. Sometimes R.F. attended the visitations, as well as her grandmother and R.F.'s two older children who are placed with different families. R.L., III's elder daughter, a half-sister of B.F., attended at least two of the supervised visits.[10]

A scheduled ASFA review hearing was held on September 11, 2018 regarding all of R.F.'s children. Therein, the Juvenile Court judge noted that DCFS was untimely in providing the required progress reports from T-PEP to all

---

[9] *State of Louisiana in the Interest of B.L.*, 18-389 (La. App. 5 Cir. 7/25/18), 2018 WL 3581517.

[10] The record indicates that A.L., R.L., III's daughter (an older half-sister of B.F.) lives with appellants approximately 80 percent of the time, though such custody is shared by agreement with A.L.'s mother, the other custodian, and is not the result of a DCFS proceeding.

of the parties. As to B.F. only, the hearing was continued until October 16, 2018. The Juvenile Court judge admonished DCFS to provide all parties with pertinent updated reports from T-PEP ten days in advance of the October hearing. The judge also clarified that appellants' intervention was limited, that they were only entitled to information as it related to appellants and their relationship with B.F, and that any information in reports regarding the mother, the foster parents, and the mother's other children was to be redacted from the reports, based upon privacy rights, and not shared.[11]

The parties to this appeal appeared for an ASFA review hearing and a permanency hearing on October 16, 2018. Also set for hearing that day were two rules filed by appellants: a motion/rule to show cause to hire an independent expert, and a rule to show cause against DCFS for contempt. The Juvenile Court judge granted appellants' motion to hire independent expert Amy Dickson, Ph.D., whom, she ruled, would be allowed to review the tape-recorded visitations between appellants and B.F. and would also be allowed to observe future visitations. Appellants were also given access to redacted reports concerning appellants and B.F. from T-PEP through DCFS, and also the home development report of their own home.

The rule for contempt concerned appellants' allegation that instead of the increased visitation with B.F. that the court had previously ordered, they in fact had reduced visitation. After hearing testimony from Ms. Gabrielle Jackson, the DCFS caseworker, that the visitation had increased since appellants had filed their rule for contempt, and argument from the parties, the court declined to hold DCFS in contempt, but asked T-PEP to consider if B.F. could handle increased visitation

---

[11] The record suggests that only R.L., III waived his privacy rights in order to share his reports with appellants (his parents).

without undue stress.[12]  The permanency hearing was continued until November 27, 2018.  The parties were advised that this would be a "firm" date.

An ASFA review hearing and the ASFA permanency hearing were held on November 27, 2018.  On November 21, 2018, the Wednesday prior to the November 27, 2018 hearing, appellants fax-filed a motion to continue the hearing, alleging that Mr. Jesse George, the child's appointed attorney, was not qualified as per the pertinent Supreme Court Rule to represent B.F.  The judge noted that the Juvenile Court did not accept fax filings and would not hear the motion to continue on the morning of the hearing.

As per their limited intervention, appellants did not participate in the permanency hearing, as that hearing concerned only whether B.F.'s parents, R.F. and R.L., III, had met their case plan goals.  At the permanency hearing, it was determined that because the parents had not made meaningful progress in their case plans, the case plan goals were changed to adoption instead of reunification.[13] Appellants returned to the courtroom to participate in the placement hearing that followed the permanency hearing.  After hearing testimony from the DCFS's expert, Devi Miron Murphy, Ph.D., who is affiliated with T-PEP, and DCFS personnel, as well as appellants' expert Dr. Dickson, and hearing closing arguments, the Juvenile Court judge found that it was in B.F.'s best interest to maintain her current placement with her foster parents.  In so finding, the judge noted that she was well aware that relative placement was statutorily preferred over foster care.  The judge stated that she gave little weight or credibility to Dr. Dickson's testimony because her involvement in the case was too limited for her to express an opinion as to what was in B.F.'s best interest.  The judge noted that no

---

[12] The observing clinicians, as well as some of the parties, reported that the great number of people in the small visitation room was stressful to B.F.

[13] The parties allege in brief that since the November 27, 2018 rulings, termination of parental rights proceedings have been initiated.

witness, expert or lay, testified that it was in B.F.'s best interest for her to be removed from her current placement with the foster parents and placed with appellants. She did find, however, that it would not be harmful for B.F. to maintain a relationship with appellants (her paternal grandparents), provided they could respect B.F.'s placement with the foster parents. The judge ordered that T-PEP look into continued visitation between the parties. Finally, the judge stayed appellants' intervention except as it pertained to continued visitation.

Appellants timely filed an appeal of the placement ruling, raising five assignments of error, to-wit:

(1) The Juvenile Court committed legal error by failing to comply with state and federal law in favor of preservation of families and relative placement.

(2) The Juvenile Court committed legal error on June 5, 2018 and November 27, 2018 when it was ordered that placement of the child could not be changed "under any circumstances" without court approval.

(3) The Juvenile Court erred by misapplying time limitations.

(4) The Juvenile Court erred by failing to hear appellants' motion and incorporated memorandum to continue the permanency hearing and for failing to grant a continuance when DCFS again failed to timely disseminate reports and proceeding with a permanency hearing while excluding appellants.

(5) The Juvenile Court erred in proceeding on November 27, 2018 with both the permanency and placement hearings without conducting a hearing on appellants' motion for expedited hearing to vacate order of continued custody of B.F. and declare such judgments an absolute nullity and by afterwards denying the motion as moot.

Prior to the lodging of the appeal in this Court, on February 5, 2019 appellants filed in the Juvenile Court the aforementioned "expedited" motions to lift the stay of their intervention, for fixed and unsupervised visitation, and for immediate implementation of a transition plan. The Juvenile Court judge summarily denied the motions relative to the intervention and transition plan on February 20, 2019, but set the motion for visitation for a hearing. Appellants/relators timely filed a writ application with this Court, seeking review

of the February 20, 2019 judgment. Regarding the writ application, appellants/relators argue that the Juvenile Court judge erred in denying their motions to lift the stay on their intervention and for immediate implementation of a transition plan without first affording them a hearing. They also argue that the Juvenile Court judge erred in denying their motions.

## LAW AND ANALYSIS

The Louisiana Children's Code was written with the intent that courts should resolve parental status and permanency of children issues in an expeditious manner. Specifically, La. Ch.C. art. 601 provides, in pertinent part, that "[t]he proceedings *shall be conducted expeditiously* to avoid delays in achieving permanency for children. This Title is intended to provide the greatest possible protection *as promptly as possible* for such children. The health, safety, and best interest of the child shall be the paramount concern in all proceedings under this Title. … This Title shall be administered and interpreted to avoid unnecessary interference with family privacy and trauma to the child, and yet, at the same time, authorize the protective and preventive intervention needed for the health, safety, and well-being of children." (Emphasis added.) *See also State in Interest of C.C.*, 18-440 (La. App. 5 Cir. 10/12/18), 256 So.3d 565, 572, n.13, *writ denied*, 18-1766 (La. 12/3/18), 257 So.3d 192. Consistent with this statutory scheme of expediency, in *State ex rel. C.P.*, 00-2703 (La. 1/17/01), 777 So.2d 470, 471, the Supreme Court stated that "[c]ourts shall avoid delays in resolving the status of the parent and in achieving permanency for the child," citing La. Ch.C. art. 1032,[14] and that "[a]ll phases of termination of parental rights proceedings are thus to be given priority," citing *State in the Interest of S.M.*, 98-0922 (La. 10/20/98), 719 So.2d 445 (La. 1998).

---

[14] La. Ch.C. art. 1032 provides, in pertinent part, that "[t]he court shall avoid delays in resolving the status of the parent and in achieving permanency for the child."

An appellate court's review of a juvenile court's determination of a permanent plan is governed by the manifest error standard. *State In Interest of T.B.*, 16-215 (La. App. 5 Cir. 9/22/16), 202 So.3d 555, 560-61, citing *State v. N.C.*, 50,446 (La. App. 2 Cir. 11/18/15), 184 So.3d 760, 770. Under this standard, the appellate court must not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. If the juvenile court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.*

## FIRST ASSIGNMENT OF ERROR

The Juvenile Court committed legal error by failing to comply with state and federal law in favor of preservation of families and relative placement.

## THIRD ASSIGNMENT OF ERROR

The Juvenile Court erred by misapplying time limitations.

These assignments of error are interrelated and are therefore addressed together.

In their first assignment of error, appellants argue that Louisiana law (in particular the Children's Code) and federal law (ASFA, 42 U.S.C. § 601, *et seq.*) place a priority on preserving families and favor that children be placed with relatives rather than in foster care. Appellants also argue extensively, within this section of their brief (rather than under the heading of their third assignment of error) that appellants were denied custody of B.F. because they were held to certain "time limits" in which to express their desire for custody of B.F. that do not exist within the statutory framework of the Children's Code.

First, appellants argue that the trial court ignored and/or misapplied various provisions of the law to that effect, including La. Ch.C. art. 622, which specifically favors relative placement of children who have been found in need of care, to-wit:

A. Prior to the continued custody hearing required in Article 624, a suitable relative or other suitable individual may seek and obtain an ex parte court order to take provisional custody of the child pending the continued custody hearing. The provisions of Code of Civil Procedure Article 3945 are inapplicable to an ex parte order rendered pursuant to this Paragraph.

B. Unless the best interest of the child requires a different placement, a child who appears to be a child in need of care and whose immediate removal is necessary for his protection from further abuse or neglect shall be placed, pending a continued custody hearing, in accordance with this priority:

(1) In the home of a suitable relative who is of the age of majority and with whom the child has been living in a wholesome and stable environment if the relative is willing and able to continue to offer such environment for the child pending an adjudication hearing and if he agrees to the safety plan.

(2) In the home of a suitable relative who is of the age of majority if the relative is willing and able to offer a wholesome and stable environment for the child pending an adjudication hearing and if he agrees to the safety plan.

(3) In the home of a suitable individual who is of the age of majority if he is willing and able to offer a wholesome and stable environment for the child pending an adjudication hearing and if he agrees to the safety plan.

(4) In foster care under the supervision of the department until further orders of the court.

(5) In a shelter care facility if the child, who is not in the custody of the department, has been the victim of human trafficking as provided for in R.S. 14:46.2 or trafficking of children for sexual purposes as provided for in R.S. 14:46.3.

This Article pertains to initial custody following the removal of the child from the situation of neglect, "pending a continued custody hearing." The record is clear that at the time B.F. was removed from her mother's custody at birth by instanter order, no suitable relative had been identified that was either available or willing to take custody of B.F. Both appellants (L.L. and R.L., Jr.) testified at the hearing on their motion for intervention on August 7, 2018 that shortly after B.F. was born, DCFS asked R.L., Jr. whether they (the grandparents) would consider

custody of B.F., and that he declined, citing uncertainty about B.F.'s paternity and a desire not to have to interact with R.F., among other reasons, as noted earlier. *See* footnote 5, *supra*.

Appellants note that at the continued custody hearing on December 14, 2017, which occurred pursuant to La. Ch.C. art. 624(A),[15] DCFS was ordered to explore all relatives for placement. They argue that this created an "ongoing obligation" as long as B.F. remains in state custody, which DCFS failed to perform. DCFS argues, however, that once appellants had (admittedly) declined placement of B.F., DCFS had no continuing duty to ask appellants to reconsider. DCFS further argues that ASFA concerns funding requirements for states and does not create a private right of action.

La. Ch.C. art. 627 pertains to further proceedings in a child in need of care case following a hearing. The record reflects that an ASFA dispositional hearing was in fact held on March 13, 2018, where both parents, R.F. and R.L., III, were given case plans with the goal of reunification with B.F. At the June 5, 2018 ASFA hearing, the court changed the case plan to include adoption, based on the status report and testimony taken at the hearing which indicated that neither parent was making meaningful progress or in compliance with their case plans.

Upon review, we find that the record shows that DCFS complied with its statutory duty to seek and consider relative placements, and that neither the statutes cited by appellants (La. Ch.C. arts. 622, 627, and 683, among others) nor case law requires the type of continuing duty argued by appellants to repeatedly approach relatives, such as appellants, who have previously declined placement. Nor do

---

[15] La. Ch.C. art. 624(A) provides:

If a child is not released to the care of his parents, a hearing shall be held by the court within three days after the child's removal or entry into custody. An order setting the hearing shall provide for appointment of counsel for the child and notice to the program approved to represent children. If a safety plan has been ordered, a hearing shall be held by the court within three days from the issuance of the safety plan order, unless the parents are in agreement with the safety plan. The parents' signature on the safety plan shall constitute evidence of their agreement with the plan.

these articles contain a requirement that relatives be notified in writing. The record shows that appellants had multiple contacts with DCFS prior to the filing of their motion for intervention, such as when R.L., III's DCFS caseworker visited their home,[16] and when they brought R.L., III to his visitations with B.F., when they could have expressed to DCFS an interest in placement of B.F., despite their contention that they were unaware of their rights. The record also shows that appellants changed their minds about seeking placement of B.F. only after they were informed by their son's attorney, around the end of May 2018, that the foster care placement could be permanent because R.L., III was not in compliance with his case plan, nor exhibiting the likelihood of success, as the status report of May 23, 2018 makes clear.[17]

Appellants thoroughly argue the point that the applicable code articles contain no express time limitations in which relatives such as themselves must seek placement. While this is accurate, as noted above, the Louisiana Children's Code was written with the intent that courts should resolve parental status and permanency of children issues in an expeditious manner. Further, the entire statutory scheme for child in need of care proceedings in the Children's Code clearly contemplates a steady time schedule under which the juvenile courts must proceed in order to achieve permanency in a child in need of care's placement.[18] The record is clear in this proceeding that appellants declined to be considered for placement when they were first contacted by DCFS shortly after B.F.'s birth, and

---

[16] The record shows that R.L., III resided with his parents until they intervened, at which time he was required to live elsewhere in order for appellants to be considered for placement.

[17] Importantly, appellants testified at the May 23, 2018 hearing that they were satisfied with B.F.'s foster parents and placement and were not interested in seeking custody of B.F. until late May or early June of 2018. They explained at the intervention hearing that until this point, they believed that B.F.'s placement in foster care would be temporary. They believed that their son would be given custody of B.F. once he "did what he needed to do" regarding his case plan.

[18] *See*, for example, the time frame set forth in La. Ch.C. arts. 624, 659, 673, and 678, which set forth particular time frames within which hearings must be held and a case plan made, as well as the timeline described in *State ex rel. M.V.*, 96-324 (La. App. 3 Cir. 1/13/99), 741 So.2d 48. Though particular statutes may have been amended since then, the timeline and timeframes described therein remain largely intact.

did not later seek placement until shortly before they filed their motion for intervention on June 22, 2018, because until shortly before that point, they apparently believed that their son would gain custody of B.F.

Appellants cite several cases which, they argue, support their position that DCFS violated state and federal law regarding the preference for relative placement by holding appellants to arbitrary time limits. We find, however, that the cited cases do not support appellants' positions. In *State in Interest of C.C.*, *supra*, 256 So.3d at 571, appellants note that an out-of-state paternal aunt, who was first identified as a relative more than one year after the child entered state custody, was granted custody after the child was with his foster family for 17½ months, with no discussion of the late time frame in which she entered the case. This case, appellants argue, shows that relative placement is favored over foster care despite the length of time the child is in foster care. However, this case has no authoritative value for that position, because on appeal this Court vacated the judgment and returned custody to the foster parents, finding legal error that prejudiced the material outcome of the case and deprived the parties of substantial rights. *Id.* at 572. This Court found that the record failed to establish the child's filiation to the putative father. *Id.* Also, the custody judgment occurred without a determination that such placement was in the child's best interests, because the trial court felt it did not have jurisdiction over the putative father because no petition had been filed against him. No discussion was made regarding the time frames in which relatives should apply for placement. Because this Court vacated the judgment of placement on the basis of lack of evidence of filiation, the merits of the judgment on appeal were not reviewed. *Id.*[19]

---

[19] This Court stated in *dicta*, however, that though it was pretermitting discussion of the assignments of error, it would find, among other issues, that the trial court committed legal error in concluding that it did not have jurisdiction over the father of a child who had been found in need of care.

Appellants also cite *State in Interest of G.H.*, 18-465 (La. App. 5 Cir. 1/30/19), 265 So.3d 960, a case in which appellants' counsel represented the paternal grandparents who did receive placement of a 22-month-old grandchild who had been in foster care for 21 months, despite having first come forward when the child was 15 months old. Appellants claim that similarly to this case, DCFS challenged placement with the grandparents on the basis that they were "too late." They also claim that, as in this case, the grandmother faced "aggressive challenges" by T-PEP and the child's CASA[20] representative, and DCFS allegedly failed to contact the grandmother regarding placement, in violation of state and federal law. Appellants argue in brief that the *G.H.* case shows DCFS "has a pattern of inconsistently applying the law and following its own policies and procedures regarding relative placement," which is "particularly egregious under the facts and circumstances of this case," and that tax dollars are "being wasted on a child who doesn't belong in foster care" and are "being frivolously spent by DCFS to assist the foster parents in attaining a free adoption … ." They argue that their expert, Dr. Dickson, opined at the permanency hearing on November 27, 2018 that B.F. can be safely transitioned to appellants.

*State in Interest of G.H.* is distinguishable both procedurally and factually from the instant case. The only issue on appeal in that case was whether the Juvenile Court judge erred in denying the former foster parents' third motion for intervention in the child in need of care proceedings, which motion was filed after custody had been changed to the grandparents upon DCFS's recommendation and subsequent approval of the Juvenile Court judge. This Court found that the foster parents lacked standing *as foster parents* when they filed their third motion to intervene, because they were no longer foster parents. *Id.* at 965. This Court

---

[20] "CASA" stands for Court Appointed Special Advocate.

further found no abuse of discretion in the trial court's denial of their third motion to intervene as "interested persons" under La. Ch.C. art. 697, and thus pretermitted assignments of error pertaining to the merits of the case. *Id.* at 965-66. This case does not support appellants' accusations against DCFS in the current case. And, as each judgment in a child in need of care proceeding turns on its own particular facts and circumstances, it is of no weight to this Court that in *G.H.*, DCFS recommended custody be awarded to the grandparents but did not so recommend in this case.

This Court has thoroughly reviewed the entire record. Our review, paying close attention to all of the proceedings and hearings, and the testimony and evidence introduced at those hearings, does not support appellants' counsel's accusations against DCFS. Further, as hereinafter set forth, the record reflects that the "time limitations" were but one of the factors the Juvenile Court judge considered when denying appellants' limited intervention and placement of B.F. based upon her determination of the best interest of B.F.

At the hearing on November 27, 2018, the Juvenile Court judge conducted an ASFA review and permanency hearing first, at which appellants were not allowed to participate, as the permanency review concerned only the parents' compliance with their case plans.[21] After ruling that the case plan goal was changed from reunification to adoption, at the placement portion of the hearing, where appellants were present, as previously noted, the trial court heard testimony from DCFS supervisor Erin Luquette, and from Dr. Murphy, affiliated with T-PEP, and the expert witness on behalf of DCFS, as well as Dr. Dickson, appellants' expert witness.

---

[21] As a matter of law, the limited intervention did not give appellants the legal right to participate in the permanency hearing, nor did R.F. waive her privacy rights so as to permit appellants to be in the courtroom during the hearing.

The Juvenile Court judge specifically found that it was not in B.F.'s best interest to be placed for custody with appellants. First, the Juvenile Court judge did consider that appellants first declined custody and then did not come forward until three months after their son's paternity of B.F. was confirmed. The judge next considered testimony from the experts, Dr. Murphy and Dr. Dickson, and from Ms. Luquette with DCFS.

Dr. Murphy, the clinician with T-PEP, had previously testified at the permanency hearing. She stated that she had two interviews with appellants of approximately one hour each. She had also supervised at least seven visits with B.F. and appellants at T-PEP every other week starting in August of 2018. She stated that appellants were always prepared for the visits, bringing food and supplies and toys. They were very loving and clearly wanted a relationship with B.F., and in fact had established a grandparent relationship with her, in Dr. Murphy's opinion.

But Dr. Murphy voiced several concerns. Initially at these visits, B.F. cried and exhibited a lot of distress, so DCFS asked the foster mother to stay in the room to help soothe her. This strategy worked and B.F. was able to interact more comfortably with her grandparents. At the scheduled visitations that occurred following the intervention, the clinicians observed L.L. to be the primary active caregiver. This raised concerns because, due to L.L.'s work schedule and R.L., Jr.'s retired status, R.L., Jr. would sometimes be the primary caregiver should B.F. be placed in their home.[22] Clinicians observed that R.L., Jr. was reluctant or unwilling to change diapers, feed the child, calm her when she was distressed, and otherwise attend to her needs. Also, R.L., Jr. demonstrated difficulty during individual parenting sessions ("Circle of Security") with T-PEP with the concepts

---

[22] L.L. is a Jefferson Parish owner-operator of a school bus for special needs children in wheelchairs. Her schedule required her to drive a shift early in the morning and another shift again during the afternoon.

that T-PEP clinicians were attempting to teach him, despite the fact that he would be B.F.'s primary caregiver while L.L. was at work. The clinicians also observed both L.L.'s and R.L., Jr.'s frequent failures to recognize B.F.'s cues and to respond appropriately to B.F.'s needs during visits without prompts by the parent educator, as well as other interactions that Dr. Murphy deemed were "intrusive" to B.F. Dr. Murphy opined that at this time, R.L., Jr. had not made meaningful progress in his ability to understand the child's needs, and thus he would not be an appropriate independent caregiver for B.F.

The testimony also related an incident from one of the supervised visits where appellants' formula was expired but appellants declined to accept a bottle from the foster mother (in brief, appellants explained that this occurred at the end of a visit, so there wasn't time to give her the bottle anyway), and another visit where appellants refused assistance from the foster mother to console B.F., who was upset. Clinicians further observed appellants discouraging B.F. from crawling toward the foster mother when she was present in the room at a supervised visit.

Dr. Murphy was also concerned that appellants seemed to be putting the needs of their son, R.L., III, who was disabled following a traumatic brain injury in 2008 and who was dealing with a decade-long opiate addiction, over the needs of B.F. This concern was based on observations made at the supervised visits. At several visits, when B.F. cried, L.L. picked her up and brought her to R.L., III to soothe, instead of soothing B.F. herself, which led her to conclude that appellants were focusing on fostering their son's relationship with his daughter rather than theirs with her. At another visit, R.L., Jr. left the visit early to transport R.L., III to a counseling appointment rather than stay to visit with B.F. DCFS was also concerned that appellants minimized their son's long-standing addiction problems, both in the amount of time he had problems, to contending that it was merely because he had hung around with the "wrong people." The clinicians also noted

that appellants had allowed R.L., III and R.F. to have unrestricted access to R.L., III's other minor daughter A.L., which at least once resulted in A.L.'s phone call to appellants to come get her because their behavior was making her afraid.[23] Dr. Murphy felt that appellants would benefit from substance abuse-informed family therapy and had recommended such.

Dr. Murphy concluded by recommending that B.F. stay in her current placement because she felt it was in B.F.'s best interest. She noted that B.F. was securely attached to her foster mother, and that her foster family was meeting all of her physical, developmental, emotional, and psychological needs. Dr. Murphy found that B.F. had reached "focused attachment" with her foster mother, and that disrupting that attachment could cause her harm, such as regression and developmental setbacks. Dr. Murphy stated that such things could be temporary depending on the quality of caregiving B.F. would receive after the change in placement, depending on both the child and the new caregiver, but that some children had trouble reforming a secure attachment after a disruption. She believed, based upon her work with appellants, that they would have "a lot of trouble" providing B.F. a secure transition and might not be able to help B.F. sufficiently to recover from the disruption. She felt that the foster mother has always done what is in B.F.'s best interest, whereas appellants have not consistently demonstrated that they could prioritize B.F.'s needs over other people's needs, such as theirs or their son's.

Dr. Murphy noted, however, that appellants are very loving towards B.F. and had attended all clinical services they had been asked to attend, even while not apparently successfully grasping all of the concepts. She opined that there is no evidence that being adopted causes harm to a child. If adopted by the foster

---

[23] At one supervised visit with B.F. that her sister A.L. attended, R.L., III introduced A.L. to the parent educator as "Meet my big little s**t." Dr. Murphy noted that A.L. appeared uncomfortable and that appellants did not intervene but only "laughed nervously."

parents, she believed it would be in B.F.'s best interest to have a relationship with appellants as grandparents, as it is important for children to know where they come from. She also noted on cross-examination that T-PEP has, in other cases, successfully transitioned children to reunify with relatives or parents. When asked directly by the Juvenile Court judge, Dr. Murphy stated that there was no good reason to disrupt B.F. from her primary attachment and psychological mother.

Appellants' expert, Dr. Dickson, testified at the placement hearing on their behalf as an expert in clinical psychology and infant mental health. She stated that she had conducted an interview with appellants, and had reviewed the DCFS home study, two redacted progress reports from T-PEP, and observed two visits between appellants and B.F. (the second visit included R.L., III and A.L.). She noted that they were making safety alterations in their home for when B.F. would be walking. She stated that they were raising their other granddaughter A.L., who was an honor student. Her review of the two recorded visits was positive, she said, in that B.F. appeared comfortable with appellants and she observed appropriate behavior between appellants and B.F. She saw no obstacles to B.F. visiting their home.

Dr. Dickson agreed with Dr. Murphy that the time it takes to transition custody really depends upon the particular child, and that it was beneficial for a child in transition to continue to have contact with former foster parents to understand they have not disappeared. Dr. Dickson stated that psychological harm can occur in a child who is "permanently separated" from their biological family, and that many children struggle with abandonment issues and feeling not wanted by their biological families. She opined that some adopted children do not do well when there is not a good emotional fit in the adopted home, and that those children struggle with the fact they were adopted even with "fabulous" adopted parents who love them very much. She felt that as children get older, it is important for them to know their whole history and have connections with siblings and extended family.

She believed that with a very thoughtful transition, B.F. could successfully transition to appellants. She agreed that she could not predict how adoption by the foster parents would affect B.F.

On cross-examination, Dr. Dickson clarified that her opinion was based upon review of the items noted above, and that she had not provided any therapeutic services to this family. She agreed that she had not observed appellants' parenting of A.L. except for reviewing one recorded visit where A.L. was present. She agreed that her recommendation was not who was a better caregiver, but whether she believed that appellants would be good caregivers. She agreed that she could not make a recommendation about what was in B.F.'s best interest, because she did not have all of the information necessary to make that determination, nor did she receive detailed information regarding R.L., III's drug and medical history.

At the conclusion of the placement hearing, the Juvenile Court judge made the following comments and rulings, to-wit:

> This Court is well aware that relative placement is preferred over foster care. I'm also well aware that because the intervenors came in some six months after the inception of [B.F.'s] case - - this case has been open since September, as it relates to [R.F.], of '17 and December of '17 as it relates to [R.L., III] - - that I have information regarding the baby and what is in her best interest through the history of this case that the intervenors are not privy to. …

> I have already ruled that it is the Court's position that adoption is in the best interest of this child in terms of the permanency plan. And I have ruled that the department is to proceed with termination of parental rights.

> In looking at the totality of the circumstances of this case and all of the evidence, and I do take judicial notice of my own record on [B.F.'s] case which began December the 12th [of 2017] when custody was granted to [DCFS] after relative placement was ruled out. I take into account the entire history of what this child went through with [the foster parents], went through medically, went through emotionally, went through with T-PEP from the inception of the case, not just when [the foster parents] got involved, but since December of 2017. And I look at what I firmly believe to be the best interest of this baby. I take into account the testimony today of the expert witnesses, the lay witnesses, and CASA and the recommendations thereof.

* * *

The testimony was very clear, there is no good reason to disrupt the placement of this child from [the foster parents].  It's not a question of what's in [L.L. and R.L., Jr.'s] best interest, of what's in [R.L., III's] best interest, or what's in [R.F.'s] best interest.  It's not a question of that.  It is a question of what is in this child's best interest in terms of her physical and emotional development right now.  Not one witness, let alone an expert witness, could tell me that it is in this child's best interest to remove her from [the foster parents] and place her with [L.L. and R.L., Jr.].

It's not that she can't know her grandparents.  She certainly can. … I don't think it's going to be harmful for this child to maintain a relationship with her grandparents, provided the grandparents can respect the placement with [the foster parents] and respect the needs of the child.

* * *

But for today's purpose, … it is clear and convincing to this Court from the entire record that it is in [B.F.'s] best interest to remain with [the foster parents] and I am so ordering.

* * *

At this point, there will be no more involvement under the intervention other than my allowing continued contact between [L.L. and R.L., Jr.] and the baby in terms of visits, as I previously discussed.  All other intervention is hereby stayed.  I'm not doing anything else in terms of this intervention.

Upon review, considering the totality of the circumstances presented herein, we find no manifest error in the Juvenile Court judge's ruling which denied appellants' intervention as to placement with them and maintained B.F.'s placement with her foster family as in her best interest.  The Juvenile Court judge clearly considered all of the evidence and testimony highlighted above.  It is clear that the Juvenile Court judge considered appellants' "suitability" and not merely the time frame in which appellants sought custody.  The record is clear that no witness, expert or lay, testified that it would be in B.F.'s best interest to be removed from her current placement and be placed with appellants.  These assignments of error are without merit.

## SECOND ASSIGNMENT OF ERROR

The Juvenile Court committed legal error on June 5, 2018 and November 27, 2018 when it was ordered that placement of the child could not be changed "under any circumstances" without court approval.

In this assignment of error, appellants argue that ultimately, DCFS has the final say on where children in need of care are placed, and that the Juvenile Court judge's orders, given at both the June 5, 2018 and November 27, 2018 hearings, exceeded the judge's statutory authority and usurped the authority of DCFS. Appellants argue that La. Ch.C. art. 672, both the version that applied prior to August 1, 2018 and the version in effect afterwards, gave DCFS "exclusive authority" for placement decisions and prohibited the court from ordering DCFS to return to court prior to moving a child from a placement.[24] Appellants argue it was not until they expressed desire for placement that the Court then made these rulings overreaching its authority.

The statutory scheme found in the Louisiana Children's Code, Title VI, which sets forth the criteria and procedures for children in need of care cases, is clear that the juvenile court has the ultimate authority over a child's placement. *State in Interest of G.H.*, *supra*, 265 So.3d at 965. While the court may not order a specific placement under Article 672, it nonetheless can find a specific placement not in the best interest of a child and order that a child be moved. In any event, any alleged overreaching by the Juvenile Court judge's June 5, 2018 and November 27, 2018 orders would be to the derogation of DCFS's statutory authority, who has not contested the Juvenile Court judge's orders and, in this case, never expressed that B.F. should be placed with appellants. This assignment of error is without merit.

## FOURTH ASSIGNMENT OF ERROR

The Juvenile Court erred by failing to hear appellants' motion and incorporated memorandum to continue the permanency hearing and for failing to grant a continuance when DCFS again failed to timely disseminate

---

[24] Appellants note that an amendment to this article, effective August 1, 2018, appears to "slightly" broaden the trial judge's authority regarding placements. *See* Act 189 of the 2018 Ordinary legislative session, amending La. Ch.C. art. 672.

reports and proceeding with a permanency hearing while excluding appellants.

Appellants argue in this assignment of error that on November 21, 2018, they filed, via fax, a motion to continue the permanency hearing on the basis that again, T-PEP and DCFS had failed to timely disseminate reports to them in violation of local rules. Appellants argue that they were "participants" in their son's case plan, and that the trial court erred in proceeding with the permanency hearing while excluding appellants from the hearing.

The appellate record does not contain a copy of the motion to continue that appellants allegedly fax-filed on November 21, 2018. The transcript of the proceedings on November 27, 2018 does not refer to or discuss a motion to continue made on this basis.[25] The transcript also shows that appellants did not object when they were ordered to step out of the permanency hearing.

Appellants' claim that they were "participants" in their son's case plan is without any legal foundation. The trial court's grant of their intervention was limited to issues of B.F.'s placement, as per the court's authority found in La. Ch.C. art. 707, and did not include any provision making appellants "participants" their son's case plan.[26] This assignment of error is without merit.

### FIFTH ASSIGNMENT OF ERROR

The Juvenile Court erred in proceeding on November 27, 2018 with both the permanency and placement hearings without conducting a hearing on appellants' motion for expedited hearing to vacate order of continued custody of B.F. and declare such judgments an absolute nullity and by afterwards denying the motion as moot.

In their final assignment of error, appellants argue that the trial court erred in proceeding on November 27, 2018 with the permanency and placement hearings

---

[25] Appellants note in brief that for "reasons unknown," the motion does not appear in the appellate record, but they have attached a copy of this motion to their writ application, 19-C-144. The attached motion shows a filing date of November 26, 2018, the day before the permanency hearing.

The transcript does refer to another late-filed motion by appellants, a motion to continue the permanency hearing based upon the child's attorney's lack of qualifications, which is the subject of the next assignment of error.

[26] Copies of the case plans are found in the appellate record. The case plans do not include appellants as participants and do not require any action by appellants.

without conducting a hearing on appellants' motion for expedited hearing to vacate the order of continued custody of B.F. This motion alleged that all prior judgments should be declared absolutely null because the attorney for B.F., Mr. Jesse George, did not appear on the Supreme Court's list of attorneys approved to represent children in foster care.[27] For the following reasons, we find no merit to this assignment of error.

Counsel for appellants filed this motion on November 27, 2018, the morning of the permanency hearing. Therein, appellants noted that the attorney for B.F. failed to appear on the list promulgated by the Supreme Court identifying those attorneys qualified to represent children in foster care. Appellants argued that the failure to have qualified legal counsel represent B.F. resulted in violation of her due process rights under both federal and state law, and thus that all prior judgments in the case should be found absolutely null, such judgments having been obtained by "fraud or mistake sufficient to justify vacating the adjudication," per La. Ch.C. art. 667.[28]

At the permanency hearing, the Juvenile Court judge refused to consider the motion, finding that it was filed untimely as to the permanency hearing.[29] The Juvenile Court judge noted that Mr. George had been representing children before the Juvenile Court for many years. Mr. George also explained that he had complied with the Supreme Court rule and did not know why his name did not appear on the list submitted by appellants' counsel. The trial judge stated that she considered Mr. George well qualified. On December 10, 2018, Mr. George filed a

---

[27] *See* La. Ch.C. art. 607 and Section 3 of La. Sup. Ct. Rule 33.

[28] La. Ch.C. art. 667(A) provides, in pertinent part:

On motion of the child or the parent, an adjudication shall be vacated and a new adjudication hearing ordered if, after contradictory hearing, the court finds that:

(1) The adjudication was obtained by fraud or mistake sufficient to justify vacating the adjudication.

[29] In the record, the order accompanying the motion contains a handwritten notation denying it as "moot" based on the hearing of November 27, 2018.

response into the court record, documenting his compliance with the Supreme Court rule. He also submitted a letter from the Supreme Court, dated December 3, 2018, acknowledging that he had completed the necessary requirements in order to represent children under Supreme Court Rule 33. Thus, Mr. George specifically refuted the occurrence of any fraud or mistake that might justify nullifying the judgments previously rendered in this case.

Upon review, we find no error in how the Juvenile Court judge handled the late-filed motion, nor on the ultimate decision to deny the motion. The record is clear that Mr. George was duly qualified to represent B.F., and that no due process violation or fraud occurred in this case, notwithstanding that Mr. George's name was not included on the Supreme Court's list.

Further, this Court notes that neither La. Ch.C. art. 607 nor Supreme Court Rule 33 states that any adjudication or judgment of disposition shall be "absolutely null" if a child's attorney is not duly qualified.[30]

Appellants further allege, for the first time in their appellate brief, that the first attorney assigned to represent B.F., Alexandra Kamp, who appeared at one hearing on her behalf on December 14, 2017, was also similarly unqualified to represent children in child in need of care cases. However, this issue was not first raised in the Juvenile Court, and thus is not preserved for appellate review.

This assignment of error is without merit.

### CONCLUSION AS TO THE APPEAL

Accordingly, for the foregoing reasons, we find no merit to appellants' assignments of error and no manifest error in the November 27, 2018 judgment of

---

[30] As noted above, La. Ch.C. art. 667 states that, "on the motion of the child or the parent," an adjudication shall be vacated and a new adjudication hearing ordered if, after contradictory hearing, the court finds that an adjudication was obtained by fraud or mistake sufficient to justify vacating the adjudication. By its own clear terms, this article does not apply to any action brought by appellants.

the Juvenile Court judge that denied appellants' intervention in terms of placement. The judgment is thus affirmed.

## REVIEW OF WRIT APPLICATION NO. 19-C-144

In their writ application, appellants/relators allege that following the ruling on November 27, 2018, and despite the trial court's recognition that appellants and B.F. had established a loving relationship and that continued visitation between them was in B.F.'s best interest, DCFS "unilaterally" terminated all scheduled visitation. Appellants/relators allege that instead, DCFS allowed future visitation to be at the complete discretion of the foster parents with no oversight by DCFS, and that the foster parents allegedly advised relators that they felt it was inappropriate for B.F. to visit with them.

Because of these alleged actions of DCFS and the foster parents, on February 5, 2019, relators filed in the Juvenile Court a pleading entitled "Paternal Grandparents' Expedited Motion to Lift Stay of Intervention, Motion for Fixed and Unsupervised Visitation, and Motion for Immediate Implementation of a Transition Plan." Therein, relators sought the lifting of the stay on their intervention, fixed and unsupervised visitation with B.F., and immediate implementation of a transition plan to transfer custody of B.F. from the foster parents to appellants. The Juvenile Court judge summarily denied relators' motions to lift the stay of their intervention and for immediate implementation of a transition plan, despite, relators argue, the testimonies of Drs. Murphy and Dickson at the November 27, 2018 placement hearing that B.F. could safely transition to appellants in around six weeks. The trial court granted a hearing on the issue of visitation. Herein, relators seek review of the trial court's rulings that denied relators a hearing on their motions to lift the stay of their intervention and for immediate implementation of a transition plan.

Relators frame the issues presented in their writ application as follows:

(1) Whether it is an abuse of the trial court's discretion to deny a hearing to grandparents on lifting a stay of intervention without hearing any reasons in support of lifting the stay, while simultaneously granting a hearing regarding their rights to visitation, particularly in a matter never before heard by the trial judge, and procedurally closing the door in the trial court to any possibility that these grandparents could ever obtain custody of or adopt their granddaughter as the delays are swiftly approaching to allow the child to be adopted by non-related foster parents.

(2) Whether it is an abuse of the trial court's discretion, in this case that was only recently transferred to a new division wherein no hearings in the matter had ever been held, to summarily deny a Motion for Immediate Implementation of a Transition Plan filed by Intervenors, the paternal grandparents, when the record supported that fact that all experts agreed transition to the grandparents could be safely done in about six weeks with no harm to the child.

Upon review, we find no abuse of discretion in the Juvenile Court judge's ruling which denied relators a hearing on their motions to lift the stay of their intervention and for immediate implementation of a transition plan, and the denial of their motions. A thorough reading of the writ application shows that in these motions filed in the Juvenile Court after they appealed the November 27, 2018 judgment, relators are attempting to secure the same relief they sought in their appeal of the November 27, 2018 judgment, which is a reinstatement of their intervention and ultimately custody of B.F. Relators' arguments in favor of relief in their writ application are substantively and substantially the same arguments they make in their appeal, that DCFS violated state and federal law to provide them notice, that the Juvenile Court judge erred holding them to "time limits" in which to seek custody, and that the Juvenile Court judge ultimately erred in not finding them a "suitable relative" for placement of B.F.[31] Their arguments in the writ application concern the same proceedings that led up to the November 27, 2018 judgment, except for alleged cancellation and/or denial of visitation with B.F. that occurred following the November 27, 2018 judgment, and for which the trial court did grant relief by setting the motion for visitation for hearing. Relators' motions

_____

[31] The vast majority of the attachments to the writ application are also found in the appellate record.

essentially asked the new Juvenile Court judge assigned to handle the case, who was not the same judge that had previously rendered judgment,[32] to effectively overturn the November 27, 2018 judgment that they had appealed but without appellate review and in a summary proceeding. There is no provision in the Children's Code, in either Title VI concerning Child in Need of Care proceedings, or the general articles on appeals found in Title III, that allows an aggrieved party who has a pending appeal of a child in need of care judgment to circumvent the appellate process in this way. Appellants/relators are not entitled to the relief requested in their writ application. Their writ application is accordingly denied.

## CONCLUSION AS TO THE APPEAL AND THE WRIT APPLICATION

For the foregoing reasons, the judgment under review in this appeal is affirmed and relators' writ application is denied.

## AFFIRMED; WRIT DENIED

---

[32] The Juvenile Court judge who rendered the November 27, 2018 judgment under review retired prior to the subject motion being filed.

19-CA-115                                    28

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

MARY E. LEGNON
INTERIM CLERK OF COURT

CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **AUGUST 9, 2019** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

_____
MARY E. LEGNON
INTERIM CLERK OF COURT

# 19-CA-115
### C/W 19-C-144

**E-NOTIFIED**
JUVENILE COURT (CLERK)
HON. ANDREA PRICE JANZEN (DISTRICT JUDGE)
ELIZABETH G. LINCOLN (APPELLEE)       JENNIFER G. WOMBLE (APPELLEE)       KRISTINE K. SIMS (APPELLANT)
LISA P. HARELL (APPELLEE)

**MAILED**
JESSE S. GEORGE (APPELLEE)
ATTORNEY AT LAW
935 GRAVIER STREET
SUITE 1340
NEW ORLEANS, LA 70112