COUNSEL FOR DEFENDANT/APPELLANT, J.M. AND R.M., Sherry A. Watters
Panel composed of Judges Susan M. Chehardy, Marc E. Johnson, and John J. Molaison, Jr.
SUSAN M. CHEHARDY, CHIEF JUDGE
*566 On appeal, foster parents, J.M. and R.M.,[1] seek review of the denial of their motion to intervene and modify the custody determination for their former foster child, J.B. For the following reasons, we vacate the trial court's ruling and remand for further proceedings.
Factual and Procedural History
In August of 2016, the Jefferson Parish District Attorney and the State of Louisiana, Department of Children and Family Services ("DCFS") received reports that four minor children - C.C., P.B., M.B., and J.B. - located in Jefferson Parish were suffering from neglect, abuse, and/or lack of supervision[2] by their mother, P.[3] At that time, C.C. was twelve years old, P.B. was nine, M.B. was four, and J.B.[4] was ten-months-old.
On September 16, 2016, as a result of the DCFS investigation, all four children were removed from their mother's custody, *567 put into the emergency custody of DCFS, and placed into foster care. At that time, the mother, who has never been married, reported that C.C., Sr. was the father of her three older children, C.C., P.B., and M.B., but not the baby's biological father.[5] On September 20, 2016, at the initial custody hearing, the trial judge found that the circumstances warranted maintaining the children in the continued custody of DCFS.
On October 5, 2016, after further investigation, the Jefferson Parish District Attorney filed a Child in Need of Care ("CINC") Petition pursuant to La. Ch.C. art. 606(A), alleging that the children were in need of care because of abuse and neglect by their mother and the prolonged absence of their fathers. On October 18, 2016, the State dismissed the CINC allegation against C.C., Sr. in reference to the baby, J.B., because the mother denied that C.C., Sr. was the baby's father. That day, J.B.'s father was listed as "unknown" and the previous appointment of the curator ad hoc to represent him was recalled.
On November 15, 2016, the trial judge held an adjudication hearing, in accordance with La. Ch.C. art. 659 et seq ., to determine if the State could prove that the children were in need of care. During that hearing, both P. and C.C., Sr. stipulated without admitting the allegations of the CINC petition that the children were in need of care pursuant to La. Ch.C. art. 647. The Court accepted their stipulations, adjudicated the children in need of care, and maintained the children in DCFS custody in their respective foster care placements.
In anticipation of the December disposition hearing, DCFS filed a report with the trial judge. In its report, DCFS listed J.B.'s father as "unknown" and specified its case plan goal for the children was "reunification with a concurrent goal of adoption."
On December 13, 2016, the trial court held a disposition hearing. After hearing the testimony, the judge found that, because the issues that brought the children into care still exist, the children were still in need of care and should remain in DCFS custody in their current foster care placements. Further, the trial judge found that the case plan submitted by DCFS is "consistent with the health and safety of the children and is in the best interest of the children ... and orders all parties to comply therewith." At the close of the disposition hearing, the trial court advised P. and C.C., Sr. that the State was statutorily required to file a petition to terminate their parental rights if the children remained in DCFS custody for a period of fifteen months out of a twenty-two month period. The judge set a status hearing for March of 2017.
On February 21, 2017, in anticipation of the status hearing, DCFS produced a progress report for the family, in which it again recommended that all the children remain in their current placement because the risk factors that brought them into care still existed. DCFS's case plan goal for all of the children at that time was "reunification with a concurrent goal of adoption." Further, the Court Appointed Special Advocate ("CASA") for M.B. and J.B. reported that her recommendation to "protect and promote the best interest of M.B. and J.B." was for the two siblings to "remain in the custody of the State and in their current placement in the certified foster home of J. and R.M."
The minute entry from the March status *568 hearing[6] reflects that the trial judge determined that the children should remain in DCFS custody as "the issues that brought them into care still exist."[7] Further, the court found that the children's current foster care placements were the "safest, least restrictive, most appropriate setting for the children at this time" and were meeting all of the children's needs. The judgment issued after that hearing states that the trial judge informed the parents that, "Federal law requires the state to file a petition to terminate parental rights when a child has been in custody for 15 of the most recent 22 months."[8] Finally, the trial judge set a permanency hearing for September of 2017.
On August 22, 2017, in anticipation of the permanency hearing, DCFS submitted a report to the trial judge again determining that the risk factors that brought the children into care still existed and recommending that the children remain in DCFS custody in their current foster care placements. In its report, DCFS specifically noted that J.B. and his sister remained in the certified foster home of Mr. and Mrs. M. where M.B. and J.B. "feel as if they are part of the family. J.B. only knows the [foster parents] as his parents ." (Emphasis added.) Finally, DCFS requested that the court accept the new case plan goal of adoption into the record.
According to a minute entry dated September 7, 2017, the trial judge learned in a pre-trial conference that P. had named D.W. as J.B.'s putative father. That day, the trial judge ordered DCFS to locate D.W., who was reportedly incarcerated, to perform genetic testing to determine if he was J.B.'s biological father. The permanency hearing for all of the children was continued until September 26, 2017.
In anticipation of that permanency hearing, DCFS reported to the trial judge, again recommending that the children continue in DCFS custody in their current placements. Although DCFS listed D.W. as J.B.'s father, the agency's report made no further mention of any paternity determination and reiterated that the case plan goal for all of the children was adoption.
At the September 26, 2017 permanency hearing, the trial judge found that the new case plan goal of adoption was in the "best interest of the children" and approved it. Further, the trial judge advised P. and C.C., Sr. of the option of voluntarily surrendering their rights and consenting to adoption. The trial judge ordered that the children remain in the custody of DCFS in their current foster care placements.
On November 21, 2017, J.B.'s court-appointed attorney moved to set a status hearing after "becoming aware" that "J.B.'s biological father"[9] proposed a "custody arrangement" that would transfer physical custody of J.B. to the father's sister in Texas. The status hearing was scheduled for February 6, 2018.[10]
In the interim, the clinicians at T-PEP were advised that DCFS might recommend *569 that J.B. be removed from his foster family and placed with his paternal aunt, L.W., in Texas. In a letter to the trial judge dated December 31, 2017, the clinicians voiced their opposition to the proposed change in custody as follows:
We are opposed to moving J.B. to his Aunt's home in Texas. J.B. has been living with [his foster family] since September 2016, when he was 9 months old. He is currently 25 months old. [His foster parents] are the only parents he knows, and it would be detrimental to his well-being to remove him from his psychological parents. J.B. has been doing well in the [foster] home, and they are committed to adopting him. In addition, J.B. has been placed with his 5-year-old sister since he was taken into care. He is very close to his sister, who would be remaining with [their foster family]. We believe it would be very detrimental to J.B.'s and his sister's well-being to separate them.
If DCFS decides to continue visits with the Aunt, we would like to be involved closely, and would like to conduct a prospective caregiver evaluation with her. In addition, we will provide a detailed transition plan to be implemented if DCFS decides to move forward with the transition, against our recommendation.
On December 27, 2017, in anticipation of the status hearing requested by J.B.'s counsel, DCFS reported to the trial court that D.W.'s sister, L.W., and her live-in boyfriend, G.C., visited J.B. in Louisiana. DCFS reported that, pursuant to the Interstate Compact on the Placement of Children ("ICPC"), the Texas Department of Family and Protective Services was investigating whether L.W. was an appropriate custodian for J.B.
On January 15, 2018, Dr. Zeanah, the Co-Director of T-PEP, wrote to DCFS, stating, in pertinent part:
As you know we strongly oppose moving J.B. to his Aunt's home in Texas. J.B. has been living with [his foster family] since he was 9 months old. He is currently 25 months old. The [foster parents] are the only parents he knows, and it would be detrimental to his well-being to remove him from his psychological parents to send him to strangers. J.B. has been thriving in the [foster] home, and they are committed to adopting him. In addition, J.B. is very close to M.B., who would be remaining with the [foster family], and to C.C. and P.B., with whom he visits [weekly]. We believe it would be very detrimental to J.B. and his siblings' ... well-being to be separated.
It is our understanding that prior to November 2017, J.B. had no contact with his Aunt. They have since had two visits together, which have reportedly gone well. Yet, it would not be in J.B.'s best interest to have a precipitous move out of state, to an aunt with whom he has had very limited contact, especially following all of the turmoil in his life. From J.B.'s perspective, this will create an unnecessarily frightening transition to a new caregiving situation.
If DCFS decides to continue visits with the Aunt, we would like to be involved closely, and would like to conduct a prospective caregiver evaluation with her. For more than 20 years, our approach in these situations has been for out of town relatives to come to New Orleans for a period of a week or two. ... We are unclear why we have not been asked to advise about the aunt's suitability or the proposed transition.
As you know, there are abundant data about the harmful effects on young children associated with multiple placement disruptions. It seems to us that we are positioned to avoid another precipitous move for J.B. We would like to align the *570 plan for J.B. with best practices concerning placement transition by providing an expected and well-planned transition.
* * *
On February 6, 2018, the trial judge held a status hearing regarding a potential change in J.B.'s placement by DCFS. J.B.'s counsel argued that it was not in J.B.'s best interest to be removed from his current placement as D.W., who had never met J.B. and was unknown until September of 2017, remained incarcerated and, thus, was not able to take custody of J.B. In response to J.B.'s counsel requesting a "best interest" hearing, the trial judge stated,
Best interest only comes into play if there are allegations against the dad.
* * *
Best interest is something that kicks in when I have jurisdiction over the dad. If he makes a plan and there are no allegations of child in need of care, there is no best interest that I could even look at.
* * *
If there are no allegations against the dad, I really don't have jurisdiction to go to a best interest finding.
That day, the trial judge sustained J.B.'s counsel's objections to any change in placement and ordered DCFS to maintain the current placement until a permanency hearing could be held.
Also, that same day, in anticipation of the permanency hearing, DCFS made a report to the trial judge. In it, DCFS reiterated that, after fifteen months as the children's custodian, its case plan goal for all of the children was adoption. DCFS reported that, since November of 2017, J.B. had been in telephone contact with his paternal relatives in Texas. Further, his aunt had visited him twice in Louisiana and, accompanied by his DCFS case worker, J.B. had visited his aunt and her family once in Texas. On February 19, 2018, DCFS notified the trial judge that "the IPCP[sic ] for Ms. L.W. was approved by Texas."
In a letter to the trial judge dated February 20, 2018, the children's CASA advocate, among other things, expressed her concern about D.W.'s desire to relocate J.B. to Dallas. To support her recommendation that the children should remain in their current placements, she stated her opinion as follows:
[M]oving a child away from his foster family, no matter the age, is traumatic, but moving him away from his siblings and the only stable home-life he'd known will be an additional trauma in his young life , not to mention the trauma for the others, losing their baby brother to be placed so far away, reducing any contact opportunities. (Emphasis added.)
On February 23, 2018, counsel for J.B. moved to enjoin DCFS from removing J.B. from his current foster care placement "without a court approved transition plan from Tulane Parenting Education Program." On February 27, 2018, the trial judge denied the motion.
During a pretrial conference before the case review hearing on February 27, 2018, counsel for J.B. filed a petition to terminate P. and D.W.'s parental rights, which the trial judge denied as premature. At the ensuing case review hearing, the trial judge ruled that he did not have jurisdiction over D.W. as no petition had been filed against D.W. Further, the trial judge found that he was precluded from holding a "best interest" hearing since there were no allegations of abuse against D.W. and D.W. had set forth a placement plan pursuant to La. Ch.C. art. 1036.2.
Specifically, in response to the foster father's ardent request to the trial judge *571 to make a "best interest" determination, the trial judge stated the following on the record:
Sir, as I said - if it was up to me [J.B.] would be going home with you right now. I don't think the law allows me to do that.
* * *
[I]t's the Court's opinion that the law doesn't give me the authority to do it. ... I feel sorry for you. As I said, I think it's ... in the best interest of the child to be with you. I think that that would be the best for the child, but I don't have the authority to do that.
* * *
If it was up to me, [J.B.] would be going home with you right now.
* * *
At the close of the hearing, over counsel for J.B.'s objection, the trial judge revoked custody of J.B. from DCFS and granted custody of J.B. to his aunt, L.W.
On March 2, 2018, J.B.'s foster parents, J.M. and R.M., moved to intervene in the proceedings and moved to modify custody of J.B. Counsel for J.B. later joined those motions. DCFS opposed both motions. At the March 20, 2018 hearing on the motion to intervene, the trial judge took the matter under advisement. On April 19, 2018, the trial judge, relying on La. Ch.C. art. 1036.2, denied the foster parents' and the child's motions to intervene and reopen and modify custody. On appeal,[11] the foster parents seek review of the change in custody, the denial of their intervention, and the denial of their motion to reopen and modify the custody determination.
Law and Discussion
Standard of Review
In Evans v. Lungrin , 97-0541 (La. 2/6/98), 708 So.2d 731, 735, the Louisiana Supreme Court enunciated the standard of review in custody proceedings:
It is well-settled that a court of appeal may not set aside a trial court's ... finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. Esco , 549 So.2d 840, 844 (La. 1989). However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. Ferrell v. Fireman's Fund Ins. Co. , 94-1252 (La. 2/20/95), 650 So.2d 742, 747, rev'd in part, on other grounds , 96-3028 (La. 7/1/97), 696 So.2d 569, reh'g denied , 96-3028 (La. 9/19/97), 698 So.2d 1388. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. See Lasha v. Olin Corp. , 625 So.2d 1002, 1006 (La. 1993). Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. See Lasha, 625 So.2d at 1006. When such a prejudicial error of law skews the trial court's finding of a material issue of *572 fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo . Lasha, 625 So.2d at 1006.
Thus, where one or more trial court legal errors interdict the fact-finding process, this Court should make its own independent de novo review of the record and determine a preponderance of the evidence. Evans, supra . Because our review of this record reveals that the trial court committed legal error, we have made our own de novo review of the record.
Paternity
Our first concern is that the record in this case lacks any proof regarding D.W.'s biological connection to J.B. Although there was discussion of genetic testing performed at the request of DCFS, results of that testing were not introduced into evidence in court. Thus, although D.W. is referred to as J.B.'s father, the record does not support that determination. Furthermore, even if those results had been properly introduced into evidence, genetic test results do not automatically convey filiation under Louisiana law.
Filiation is the legal relationship between a child and his parent. La. C.C. art. 178 ; Dep't of Children & Family Servs. ex rel. A.L. v. Lowrie , 14-1025 (La. 5/5/15), 167 So.3d 573, 579. In Louisiana, filiation is established by proof of maternity or paternity or by adoption. La. C.C. art. 179. In the event that the parents are not married[12] at the time of the child's birth, a biological father has two options to establish his paternity of a child not filiated to another man: one is to acknowledge the child in an authentic act and the second is to file filiation proceedings in a court of competent jurisdiction. La. C.C. art. 196 ; La. C.C. art. 198 ; La. R.S. 9:408.
Before instituting filiation proceedings, the alleged biological father may petition a court to order blood testing to establish biological paternity. La. R.S. 9:398.2(B). However, La. R.S. 9:398.2(E) precludes the court from making a paternity determination based on the test results and conclusions of the experts filed in the record. Instead, La. R.S. 9:398.2 specifically states that "the test results shall be admissible in any subsequent action filed by any of the parties relating to filiation of the child." Thus, the statutory law requires a putative father to file an action to establish filiation, rather than allowing the test results alone to establish filiation. Accordingly, we find that the juvenile court judge committed legal error in this matter by allowing possible DNA results to equate to filiation under Louisiana law. Finding legal error that prejudiced the material outcome of this matter and deprived the parties of substantial rights, we vacate the trial court's February 27, 2018 ruling revoking custody from DCFS and granting custody to L.W., reinstate custody to DCFS, and remand for further proceedings consistent with this opinion.
Because we are vacating the change in custody with respect to J.B., we pretermit discussion of further legal errors[13] that were evident in this case. But if *573 this Court were to review further claims, it would point out that the juvenile court has exclusive original jurisdiction over CINC proceedings, which gives the juvenile court "exclusive original jurisdiction ... over any child alleged to be in need of care and the parents of any such child." La. Ch.C. art. 303(2) ; La. Ch.C art. 604. Thus, in a CINC proceeding, once a person is established to be a parent, the law gives the juvenile court jurisdiction over that parent. Here, if D.W. was properly filiated and established as a parent, the trial court would have jurisdiction over him under La. Ch.C. art. 604 by virtue of the child being the subject of CINC proceedings.
Conclusion
Based on the foregoing, we vacate the trial court's February 27, 2018 ruling revoking custody from DCFS and granting custody to L.W., reinstate custody of J.B. to DCFS, and remand for further proceedings consistent with this opinion.
VACATED AND REMANDED.

To protect the identity of the minor children involved, the parties will be referred to using initials. U.R.C.A. 5-1, 5-2; L.R.F. v. A.A ., 13-797 (La. App. 5 Cir. 2/26/14), 133 So.3d 716, 717 n.2.

The petition to begin the children in need of care proceedings in this case indicated that the mother's sister reported her concerns for the safety of the children because, on a recent visit, she had observed no food in the house and no formula for the baby. Further, the children's aunt reported that her sister was not "mentally present" and was making bizarre statements about buying a "house in China for $1.00."
Further, when child protection investigators entered the mother's house, they located two of the children hiding in the master bedroom closet and the mother hiding naked under the bed in that room. When the investigators encountered the children, they noticed that the children were not groomed and had foul body odor. The eldest child, C.C., had a large and obvious bruise on his thigh. Investigators observed at least five cans of food with several punctures from a knife or sharp object.
When investigators spoke with the mother, she stated strange things, such as: "all of the ligaments have been taken from my body;" that she was kidnapped by the mob; that she worked for DCFS under a different name; that "someone had replaced her kids with black kids, her kids were white ... and these were not her children;" and that her sister "went into my daughter's room and put peas all over it, peas all over my house too. And she knows that my family doesn't even like peas."
The children reported that they were not allowed to go outside or to open the door for anyone. They stated their mother has physically choked them on several occasions. The eldest child asked the investigators for help to get out of the situation. Additionally, the child protection investigator discovered that none of the three school-aged children were enrolled in school or being homeschooled. Finally, the property manager at the mother's complex stated, on two separate occasions, when the manager needed access to the property, there was no adult in the home at the time.

As the mother and one child have the same initials, the mother will be referenced as P. in this opinion.

J.B. was born November 25, 2015.

Although it is not relevant to this appeal, we note that C.C., Sr. was, and remains, incarcerated and, thus, could not take custody of his biological children.

There is no transcript of that hearing in the appellate record before us.

In May of 2017, on recommendation from the clinicians at T-PEP, DCFS moved to suspend P.'s visits with her children until P. is psychiatrically stable as her visits have a "harmful impact" on the children. The trial court granted the motion and suspended visitation.

The children were taken into care on September 16, 2016.

The record before us does not contain genetic test results for either J.B. or D.W.

Due to inclement weather all over Louisiana, the status hearing, which was originally scheduled for January 17, 2018, was postponed until February 6, 2018.

Within days of the denial of their motions to intervene and reopen the matter, the foster parents filed an application for supervisory review with this Court. Finding that the judgments involved were appealable and, thus, not properly reviewable under our supervisory jurisdiction, this Court, on May 3, 2018, granted the intervenors' writ application "for the limited purpose of remanding this matter to the juvenile court for preparation and lodging of the record for appeal." On June 5, 2018, the juvenile court judge granted a motion and order for appeal directing the Clerk of Court for Juvenile Court to prepare the record, which was lodged electronically with this Court on July 31, 2018. Because the matter arises from a child in need of care proceeding, this appeal was set on the first available docket pursuant to U.R.C.A. 5-1 et seq .

The husband of the mother is presumed to be the father of a child born during the marriage or within three hundred days from the date of the termination of the marriage. La. C.C. art. 185.

Further, we note that the purpose of Child in Need of Care proceedings, is "to protect children whose physical or mental health and welfare is substantially at risk of harm ... and who may be further threatened by the conduct of others ...." La. Ch.C. art. 601. Specifically, La. Ch. C. art. 601 states that, "The health, safety, and best interest of the child shall be the paramount concern in all proceedings under this Title." (Emphasis added.) More specifically, "the child's interest is paramount over that of the parent in balancing the sometimes competing interests between the rights of the parent and a child's best interest ...." State ex rel. J.A. , 99-2905 (La. 1/12/00), 752 So.2d 806, 811 ; State ex rel. J.T.C. , 04-1096 (La. App. 5 Cir. 2/15/05), 895 So.2d 607, 616. Here, the trial judge stated numerous times during the February 27, 2018 hearing that, in his opinion, J.B. should remain in the custody of DCFS in his foster care placement. Thus, if we were to reach the merits of this matter, we would find further legal error in the trial judge's February 27, 2018 ruling made in contravention of what the judge believed to be the best interest of J.B.