STATE OF LOUISIANA IN THE INTEREST
OF C. C., JR., P. B., M. B., J. B.

NO. 20-CA-307

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE JEFFERSON PARISH JUVENILE COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 16-CC-85, DIVISION "C"
HONORABLE BARRON C. BURMASTER, JUDGE PRESIDING


March 17, 2021


**ROBERT A. CHAISSON**
**JUDGE**


Panel composed of Judges Robert A. Chaisson,
Stephen J. Windhorst, and John J. Molaison, Jr.


**AFFIRMED**
    **RAC**
    **SJW**
    **JJM**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA, DEPARTMENT OF CHILDREN AND FAMILY
SERVICES
       Rachel E. Hurd

COUNSEL FOR INTERVENOR/APPELLANT,
J. M. AND R. M.
       Sherry A. Watters
       Marta A. Schnabel

COUNSEL FOR PARENT/APPELLEE,
D. W., FATHER
       Jennifer G. Womble

**CHAISSON, J.**

In this child in need of care proceeding, J.M. and R.M., the former foster parents of J.B.,[1] appeal the July 17, 2020 judgment of the Jefferson Parish Juvenile Court that granted D.W., the biological father of J.B., a new trial on his motion to establish paternity, found D.W. to be the father of J.B., granted D.W. immediate unsupervised custody of J.B., dismissed the motion to intervene filed by J.M. and R.M., and closed the child in need of care proceeding as to J.B. For the reasons that follow, we affirm.

**FACTS AND PROCEDURAL HISTORY**

On November 25, 2015, P.B., who was not married at the time, gave birth to a son, J.B. No father was named on J.B.'s original birth certificate.

On September 16, 2016, as a result of an investigation by the Louisiana Department of Children and Family Services ("DCFS") into allegations of abuse and neglect, J.B., who was ten months old at the time, along with his three older siblings, were removed from the custody of their mother, P.B., put into the emergency custody of DCFS, and placed into foster care. J.B. and his sister, M.B., were placed in the certified foster home of J.M. and R.M. It is noted that at this point in the proceedings, C.C., Sr., was named as the father of the three oldest children; however, the father of the youngest child, J.B., was listed as "unknown."[2]

On October 5, 2016, the Jefferson Parish District Attorney filed a child in need of care ("CINC") petition pursuant to La. Ch.C. art. 606(A), alleging that the children were in need of care because of abuse and neglect by their mother, P.B., and the prolonged absence of their father, C.C., Sr. On October 18, 2016, the State

---

[1] To protect the identity of the minor children involved, the parties will be referred to using initials. U.R.C.A. 5-1, 5-2; *L.R.F. v. A.A.*, 13-797 (La. App. 5 Cir. 2/26/14), 133 So.3d 716, 717 n.2, *writ denied*, 14-655 (La. 4/17/14), 138 So.3d 633, *cert. denied*, 574 U.S. 871, 135 S.Ct. 224, 190 L.Ed.2d 134 (2014).

[2] As DCFS had no information regarding the biological father of J.B, no one was served as the father of J.B. with notice of the instanter custody order or the continued custody hearing.

dismissed the CINC allegation against C.C., Sr., in reference to J.B. because C.C., Sr., is not the father of J.B.

On November 15, 2016, the juvenile court held an adjudication hearing, at which time P.B. and C.C., Sr. stipulated that the children were in need of care without admitting the allegations of the CINC petition. The juvenile court accepted their stipulations, adjudicated the children in need of care, and maintained the children in the custody of DCFS in their respective foster care placements.[3] At the subsequent disposition hearing conducted on December 13, 2016, the juvenile court determined that the children were still in need of care and should remain in the custody of DCFS in their current foster care placements.

The matter was eventually scheduled for a permanency hearing in September of 2017. According to a minute entry dated September 5, 2017, the juvenile court learned in a pre-trial conference that D.W. had recently been identified as the possible father of J.B., who up to this point in the proceedings, had been listed as "unknown." In light of this information, the juvenile court ordered DCFS to locate D.W., who was reportedly incarcerated, to determine if he was J.B.'s biological father.

D.W. subsequently submitted a DNA sample for testing. The DNA report, dated October 26, 2017, revealed D.W. to be the biological father of J.B. The report specified the probability of D.W.'s paternity to be 99.9995%.[4] According to DCFS, once notified, D.W. and his family cooperated fully with DCFS, and D.W. had a plan in place to have J.B. placed with his sister, L.W., who lived in Texas and was participating in the Interstate Compact for the Placement of Children (ICPC). While awaiting ICPC approval, L.W. began visiting and having phone

---

[3] M.B. was subsequently adopted by J.M. and R.M. in September of 2018.

[4] La. R.S. 9:397.3(B)(2)(b) provides, "A certified report of blood or tissue sampling which indicates by a ninety-nine and nine-tenths percentage point threshold probability that the alleged father is the father of the child creates a rebuttable presumption of paternity."

contact with J.B., who was still residing with his foster parents. Ultimately, after numerous court hearings and the consideration of various reports, the juvenile court, on February 27, 2018, relying upon the DNA results revealing D.W. to be the biological father of J.B., revoked custody of J.B. from DCFS and granted custody of J.B. to his paternal aunt, L.W., who, by this time, had been ICPC approved as an appropriate placement.

Thereafter, on March 2, 2018, J.B.'s foster parents, J.M. and R.M., moved to intervene in the proceedings and moved to modify custody of J.B. Counsel for J.B. later joined in these motions. After a hearing, the juvenile court took the matter under advisement, and on April 19, 2018, relying on La. Ch.C. art. 1036.2,[5] denied the motions to intervene and reopen and modify custody. J.M. and R.M. thereafter appealed, seeking review of the change of custody, denial of their intervention, and denial of their motion to reopen and modify the custody determination.[6]

---

[5] La. Ch.C. art. 1036.2 provides, in part, as follows:

> A. An incarcerated parent of a child in the custody of the department shall provide a reasonable plan for the appropriate care of his child other than foster care. Failure by the incarcerated parent to provide an appropriate plan may result in an action to terminate his parental rights.
>
> B. Within thirty days of notification that a parent of a child in foster care is incarcerated in this state, a representative of the department shall visit the incarcerated parent and give written notification to the incarcerated parent of his duty to provide a reasonable plan for the appropriate care of the child. The department, at that time, shall obtain information regarding the plan, including the names, addresses, cellular numbers, telephone numbers, and other contact information of every potential suitable alternative caregiver.
>
> C. The incarcerated parent shall provide the department with the required information in writing within sixty days of receipt of the notification form. During that period, a parent may submit additional information or names of other caregivers using the form attached to the notice. The department shall provide the parent with a stamped, self-addressed envelope for this purpose. No additional caregiver names will be accepted after the expiration of the sixty-day period, as evidenced by a postmark.
>
> D. The department shall conduct an assessment of the persons named as caregivers by the incarcerated parent and shall notify the parent within ten days of completion of the assessment whether the persons named are willing and able to offer a wholesome and stable environment for the child.

[6] It is noted that the foster parents originally filed a writ application in this Court seeking review of the juvenile court's rulings. Upon review of the writ application and attachments thereto, this Court found that the juvenile court judgment revoking DCFS' custody of J.B. was an appealable judgment. This Court further found that relators, as interested parties in the CINC proceedings pertaining to J.B., timely sought review of the juvenile court's February 27, 2018 judgment. Accordingly, their writ application was granted for the limited purpose of remanding the matter to the juvenile court for preparation and lodging of the record for appeal. *State in the Interest of J.B. and M.B.*, 18-234 (La. App. 5 Cir. 5/3/18) (unpublished writ disposition).

On October 12, 2018, this Court vacated the trial court's February 27, 2018 judgment that revoked custody from DCFS and granted custody to L.W., reinstated custody of J.B. to DCFS, and remanded for further proceedings. This Court, in particular, found that the juvenile court committed legal error that prejudiced the material outcome of this matter by allowing possible DNA results to equate to filiation under Louisiana law. In so ruling, this Court noted that the DNA results were not introduced into evidence in court, and even if they had been properly introduced, "genetic test results do not automatically convey filiation under Louisiana law." *See State in the Interest of C.C., Jr., P.B., M.B., J.B.*, 18-440 (La. App. 5 Cir. 10/12/18), 256 So.3d 565, 572, *writ denied*, 18-1766 (La. 12/3/18), 257 So.3d 192.

After this matter was remanded, the juvenile court, on October 30, 2018, granted the former foster parents' motion to intervene, but denied their request that custody be transferred to them, instead ordering that J.B. have visitation with them on a regular basis. In addition, the juvenile court ordered that all parties be assessed to determine the best interest of J.B. as to placement. The foster parents thereafter sought review of the juvenile court's judgment that denied their request for transfer of custody of J.B. from L.W. to them, asserting the ruling was contrary to this Court's October 12, 2018 opinion. This Court denied the foster parents' writ application noting that in this Court's prior opinion, we reinstated custody of J.B. to DCFS, but did not order that J.B. be placed with the foster parents "as we do not have the authority to do so." In so ruling, this Court cited La. Ch.C. art. 672(A) that provides that DCFS shall have the sole authority over the specific placement of children assigned to its custody. *See State in the Interest of C.C., Jr., P.B., M.B. and J.B.*, 18-634 (La. App. 5 Cir. 11/8/18) (unpublished writ disposition).

In the meantime, on November 9, 2018, D.W. filed a motion to modify disposition asking that he be granted custody of J.B. In his motion, he asserted that he had been released from prison on September 7, 2018, that he had moved to Texas and was visiting with his son daily, that he had obtained gainful employment and was therefore able to support his son, and that he had complied fully with every request that DCFS had made of him. Thereafter, pursuant to a motion filed by DCFS, the record was supplemented to include a certified putative father registry certificate showing D.W. is registered as the biological father of J.B.

In response, J.M. and R.M., the former foster parents, filed exceptions of lack of procedural capacity/standing and no right of action contending that D.W.'s registry with the putative father registry is insufficient to establish filiation or any legal right to the child, other than possibly visitation. In the alternative, the former foster parents filed a motion for interim extended visitation.

On December 11, 2018, the juvenile court conducted a hearing on the motion to modify disposition as well as a best interest hearing. Dr. Amy Dickson testified about the evaluations she conducted of J.B., his aunt, L.W., and his former foster parents, J.M. and R.M., on November 26, 2018. During her testimony, she detailed her observations and the interactions between J.B. and L.W. and J.B. and his former foster parents, concluding that all three caregivers were very loving and clearly committed to J.B. and that J.B. has an attachment to both his aunt and his former foster parents. When Dr. Dickson was asked whether she could give the Court guidance as to what would be in J.B.'s best interest going forward, Dr. Dickson replied:

> I think it's a difficult decision for the judge. The good news is lots of people love this little guy. He's clearly happy. He's thriving. He's doing terrifically. And that's due to all three of these caregivers giving him a lot of love and support.
>
> I think [J.B.] would do well in either home. He will be loved and cared for very well in either home. It's a very tough decision for

the judge because he has family in both places. And my recommendation is no matter where he goes permanently, it's my hope that he will be able to visit the other home and spend time with those family and relatives in that home.

After considering the evidence presented as well as arguments of counsel, the juvenile court denied D.W.'s motion to modify disposition, ordered legal custody to remain with DCFS and J.B. to remain in his current placement with his aunt in Texas, and granted J.M. and R.M.'s motion for extended visitation. In addition, the Court found D.W. to be the biological father of J.B., noting that he has done everything to establish his parental rights, and denied the former foster parents' exceptions. Thereafter, J.M. and R.M. filed a writ application in this Court seeking review of the juvenile court's denial of the exceptions.

On March 25, 2019, this Court granted the foster parents' writ application and vacated the juvenile court's ruling denying their exceptions of lack of procedural capacity/standing and no right of action. This Court found that based upon the limited information provided in the writ application, "we cannot say that D.W. has proven even that he properly executed a formal acknowledgement since our prior opinion was rendered." See *State in the Interest of C.C., Jr., P.B., M.B. and J.B.*, 18-728 (La. App. 5 Cir. 3/25/19) (unpublished writ disposition).

In the meantime, allegations surfaced that J.M. engaged in inappropriate sexual behavior with J.B. during one of their overnight visits in Texas. As a result of these allegations, the juvenile court suspended J.M.'s visitation with J.B., but allowed R.M. and M.B., J.B.'s sister, to have FaceTime visits with J.B. In addition, the State filed a motion to dismiss the foster parents' intervention based on the allegations of sexual misconduct. However, the juvenile court deferred ruling on the motion pending completion of the criminal investigation in Texas. Ultimately, the Texas Grand Jury handed down a "no bill" and failed to indict J.M.

on the sexual assault charges.[7]  It is noted that during the delay in these proceedings due to the ongoing investigation, J.B. was maintained in the custody of DCFS, resided with his aunt, L.W., and was allowed FaceTime visits with R.M. and his sister, M.B.

On January 21, 2020, the juvenile court again took up the matter of the paternity of D.W.  After considering the testimony of witnesses and the documents presented, the juvenile court ruled that the act of acknowledgment did not meet the requirements of La. R.S. 9:408 insofar as J.B.'s mother had not signed it and that D.W. did not have standing in the proceedings.

Thereafter, D.W. filed a motion for new trial on the paternity issue.  The matter came for hearing on July 17, 2020, at which time the juvenile court granted D.W.'s motion for new trial and allowed his attorney to proceed to offer proof of his paternity.[8]  At the hearing, Erin Luquette, the DCFS case worker, testified that once P.B., the child's mother, named D.W. as the possible father of J.B., DCFS arranged to have DNA testing done to determine paternity and thereafter obtained the results of the testing, which she identified in court as an original certified copy.  She also identified the certified copy of the amended birth certificate of J.B. that showed D.W. now named as the father.  Ms. Luquette testified that as soon as

---

[7] DCFS in Louisiana also conducted an investigation into the allegations of inappropriate sexual behavior by J.M. that allegedly occurred during one of the visits in Texas.  After DCFS found the allegations to be valid, J.M. sought administrative review.  The administrative law judge affirmed DCFS' valid findings of sexual enticement and sexual intercourse.  J.M. thereafter appealed this decision to the Jefferson Parish Juvenile Court.  Upon review, the juvenile court reversed the findings of the administrative law judge and overturned DCFS' valid findings of sexual abuse.  DCFS filed an appeal in this Court seeking review of the juvenile court's ruling and asking this Court to uphold the findings of the administrative law judge. *State in the Matter of J.M.*, Appeal Number 20-CA-309 (which has been designated as a companion case to the present appeal).

[8] Prior to the start of the paternity hearing, DCFS and D.W.'s attorney asserted that the former foster parents are not parties to the paternity hearing and asked that they be excused.  The juvenile court noted their objection but allowed the former foster parents and their attorneys to be present, noting, "the Court had a question about whether or not they even had standing to raise the paternity issue, but the Fifth Circuit let them raise it, and they brought it in, so I'm going to allow them to remain in the courtroom with regards to the paternity issue."  We note that in a CINC proceeding, the role of foster parents is limited, and in this matter, they were given much leeway in their participation, even after they were no longer J.B.'s foster parents. *See* La. Ch.C. arts. 695 and 697 and *State in the Interest of G.H.*, 18-465 (La. App. 5 Cir. 1/30/19), 265 So.3d 960, 965.

D.W. was notified that he was the father, he obtained a case plan and completed a Partners in Parenting Course during his incarceration. She further testified that, since his release from prison, D.W. has acted as J.B.'s father and has taken an active part in J.B.'s life through regular visitation, bringing him to doctors' appointments and therapy appointments, and participating in all of his life activities, such as birthday parties and family outings. According to Ms. Luquette, D.W.'s active participation in J.B.'s life proved to DCFS that he is committed to his child.

D.W. also testified at the hearing. He admitted he had a sexual relationship with J.B.'s mother, acknowledged in court that he is J.B.'s father, and identified in court the acknowledgement of paternity that he executed. He maintained that he did not know that P.B. was pregnant or that she had this baby prior to the notice by DCFS while he was incarcerated. D.W. affirmed that he wants to be and has been an active part of his son's life and has taken financial responsibility for him. He testified that he sees J.B. at least three times a week, that J.B. calls him dad, and that he is willing to take on the rights as well as responsibilities of being a father.

After considering the testimony and exhibits presented, including the complete and certified DNA test results, an original acknowledgment of paternity affidavit executed by both the mother and D.W., and a certified copy of the amended Louisiana birth certificate listing D.W. as the father of J.B., the juvenile court found that D.W. is the father of J.B., noting that he has complied with all the statutory requirements.

After finding D.W. to be the father, the juvenile court then considered the motion by DCFS to have the CINC proceeding dismissed as the father had completed the required case plan. At that point, Ms. Luquette, the DCFS case worker, testified about D.W.'s compliance with the case plan. Ms. Luquette testified that she has been working on the case since September 2016, that D.W.

was located in 2017, and that he obtained a case plan shortly thereafter. She referenced the most recent case plan of April 20, 2020, and testified that D.W. has completed his case plan. Specifically, D.W. had safe and stable housing and had been approved by DCFS in Louisiana and by Texas ICPC as a relative placement for his child. In addition, D.W. was working full-time, was an active part of J.B.'s life, and was co-parenting J.B. with his sister.

Further, D.W. was complying with his parole conditions and had received random drug screens over the prior two years as part of his parole, none of which had been positive for drugs. According to Ms. Luquette, D.W. had actually been put on low status by his parole officer because he was not at risk of re-offending. D.W. completed a substance abuse assessment at the beginning of his case and also completed a parenting program while incarcerated. Ms. Luquette asserted that D.W. is an active part of J.B.'s life, that J.B. considers D.W. his dad, and that J.B.'s medical, emotional, and developmental needs are being met. Based on D.W.'s compliance with his case plan, DCFS recommended that custody be granted to D.W. and that the case be closed.

After considering the evidence presented, the juvenile court judge granted DCFS's motion to dismiss the intervention, granted immediate unsupervised custody to D.W., and closed the case, stating, in part, as follows:

> I do find that [D.W.] has completed his case plan as required by law.
> … But based on the fact that he has completed his case plan and there
> is a statement that there is no concern for the health and safety of the
> child, I am going to order that the child be put back in [D.W.'s]
> custody and that the case be dismissed.
>
> I'll note two main things to remember when this case first came about.
> [D.W.] was not able to take custody of the child. He had a plan for
> the child, but he was not able to take custody at that time because he
> was still incarcerated. That's been a change. He's now not in
> custody. He's not simply making a plan for his child. He's actually
> available for the child and he has completed a DCFS case plan.
>
> There has been no motion to not have reunification efforts under
> 672.1 so reunification is mandated if it can be achieved. Further,

when this first happened, there was [sic] questions about whether the child, through his attorney, objected to the case plan. Ms. Legendre, who represents the child's interest -- everyone else represents other interests -- has filed a motion to have the best-interest hearing taken care of, that the permanency of [J.B.] is best served by being returned to his father at this time. I do believe you joined in with DCFS's motion for all this to take place.

So at this time, I am going to grant the motion to dismiss the intervention and the best-interest hearing. The case will be closed.

J.M. and R.M., the former foster parents, now appeal, requesting that this Court vacate the July 17, 2020 judgment and reinstate the permanent plan for their adoption of J.B. On appeal, they list two assignments of error: 1) The trial court erred in granting D.W.'s motion for new trial, allowing him a fourth chance to establish paternity, but preventing evidence of timeliness, fitness, and other elements necessary to a finding of best interest; and 2) The trial court made a mistake of law in applying La. Ch.C. art. 682 to a CINC case that was far past disposition, and improperly awarding custody to a putative father on the basis of alleged completion of an unapproved, deficient case plan that did not address the child's best interest, safety, or the requirements of La. R.S. 9:364. They further assert that since the decisions at issue are rulings of law, and not factual determinations, this Court has the authority to undertake a *de novo* review of this case. Alternatively, they argue that this Court should use an abuse of discretion standard if we determine that the juvenile court's rulings were not errors of law.[9]

In response, DCFS and D.W. assert that the juvenile court did not err in granting D.W.'s motion for new trial on the issue of paternity because D.W. was not subject to any time limitation in establishing his paternity in this case. Further,

_____

[9] It is well settled that a court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." However, when one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. *Evans v. Lungrin*, 97-541 (La. 2/6/98), 708 So.2d 731, 735. Because our review of the record reveals no legal errors committed by the juvenile court (subsequent to the prior appeal in this case), we will apply a manifest error standard of review to the juvenile court's factual determinations.

they point out that the best interest of J.B. was paramount throughout the entirety of the proceedings, and that evidence was in fact presented as to J.B.'s best interest at the July 17, 2020 hearing, which resulted in custody of J.B. being returned to his father.

**DISCUSSION**

In their first assignment of error, the foster parents contend that the juvenile court erred in granting D.W. a new trial on the issue of paternity. They argue that D.W. did not establish grounds for a new trial and his fourth attempt to establish paternity was untimely. In particular, the foster parents assert that on July 17, 2020, D.W. "did not establish grounds for a new trial as to his paternity in that no proof was offered that the three previous holdings were a mistake of law or fact. The evidence available in July of 2020 had been available earlier, but it had not been offered." To support this argument, the foster parents point to La. C.C.P. art. 1972, which sets forth mandatory grounds for new trial. Admittedly, D.W. did not prove that he was entitled to a new trial based on the three grounds articulated in La. C.C.P. art. 1972. However, pursuant to La. C.C.P. art. 1973, "A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law." For the reasons that follow, we find that the juvenile court did not abuse its discretion in granting relator a new trial on the paternity issue.[10]

Regarding the former foster parents' arguments pertaining to the timeliness of D.W.'s ability, by reliance upon a motion for new trial, to eventually establish his legal filiation to J.B., we note that La. C.C. art. 198, which deals with the time periods for establishing paternity, reads as follows:

---

[10] With regard to his ruling on the motion for new trial, the juvenile court judge noted: "I will point out that whether or not he can have the new trial, it wasn't based on a finding that he wasn't the father. It was based on the legal insufficiency of that actual acknowledgment document. So I granted the new trial based on the fact that the document has been properly filled out and now they have made the motion for new trial. I did not rule in the past that he was not the father. I just ruled that the documents were not proper at the time."

> A man may institute an action to establish his paternity of a child at any time except as provided in this Article. The action is strictly personal.
>
> If the child is presumed to be the child of another man, the action shall be instituted within one year from the day of the birth of the child. Nevertheless, if the mother in bad faith deceived the father of the child regarding his paternity, the action shall be instituted within one year from the day the father knew or should have known of his paternity, or within ten years from the day of the birth of the child, whichever first occurs.
>
> In all cases, the action shall be instituted no later than one year from the day of the death of the child.

The one-year and ten-year time constraints in this article do not apply to this case as J.B. is not presumed to be the child of another man, and J.B. is alive. Therefore, pursuant to the express language of La. C.C. art. 198, D.W. was able to institute his action to establish his paternity of J.B. "at any time." However, because this is a CINC proceeding, we have carefully examined the specific provisions of the CINC articles of the Children's Code to ascertain whether those provisions contain a time limitation for a previously unknown father to institute action to establish his paternity. After such examination, we are unable to identify any such provision that specifically addresses this question. Nor have the former foster parents cited any such provision to this Court.

La. Ch.C. art. 601 provides that CINC "proceedings shall be conducted expeditiously to avoid delays in achieving permanency for children" and the provisions of the CINC Title are "intended to provide the greatest possible protection as promptly as possible for such children." Furthermore, the CINC provisions provide time restrictions within which various stages of the proceedings should be achieved and various review hearings held, all with the objective of achieving prompt permanent placement of a child who has been removed from his parents. *See, e.g.*, La. Ch.C. art. 632 (time for filing petition), La. Ch.C. art. 659 (time for adjudication hearing), La. Ch.C. art. 678 (time for disposition hearing),

20-CA-307                                    12

La. Ch.C. art. 692 (time for case review hearings), and La. Ch.C. art. 702 (time for permanency hearing).

Despite the stated goal of expeditious resolution of a CINC proceeding by permanent placement of the child and the numerous provisions providing timelines for various stages of the proceedings and review hearings, the Louisiana Legislature has not provided a time limitation in the CINC Title within which a previously unknown father must institute an action to establish his paternity. Indeed, in a CINC proceeding, the Children's Code imposes a "continuing responsibility of all persons before the court to advise the department and the court in writing of the whereabouts … of an absent parent and the identity and the whereabouts … of any relative or other individual willing and able to offer a wholesome and stable home for the child." La. Ch.C. art. 684(E)(4); *See also* La. Ch.C. art. 682(B)(4). Clearly, the Children's Code contemplates that until such time as a permanent placement is achieved and the CINC case is closed, the juvenile court must explore all possible resources to provide a wholesome and stable home for the child, which must include a biological parent whose rights have not been terminated.[11]

In this case, as soon as P.B. advised DCFS in September of 2017 of the identity of J.B.'s father, DCFS contacted him, and he submitted to DNA testing, which confirmed his paternity of J.B. At the time of this occurrence, this case had not progressed to the point of termination of parental rights with regards to D.W.[12] Furthermore, despite the fact that a year later this Court vacated the juvenile

---

[11] The Children's Code defines "permanent placement" as "(a) return of the legal custody of a child to his parent or parents; (b) placement of the child with adoptive parents pursuant to a final decree of adoption; or (c) placement of the child with a legal guardian." La. Ch.C. art. 603(22).

[12] In CINC cases, the grounds for termination of an unknown father's parental rights do not arise until "the child is in the custody of the department pursuant to a court order for at least one year, unless sooner permitted by the court …" La. Ch.C. art. 1015(10). In this case, J.B. was in court-ordered DCFS custody just short of one year when P.B. identified D.W. as his father in September of 2017. Even six months later, at a pretrial conference prior to a case review hearing on February 27, 2018, the juvenile court denied as premature a motion filed by J.B.'s counsel to terminate D.W.'s parental rights.

court's February 27, 2018 ruling that transferred *custody* of J.B. from DCFS to L.W., because D.W. had not sufficiently proved his legal filiation to J.B., we note that the juvenile court was well within its discretion to maintain *placement* of J.B. with L.W., D.W.'s sister, and to allow D.W., who had shown his biological relationship to J.B. through DNA test results, to continue to work his DCFS case plan in an effort to gain custody of his son.[13] Given this posture, as well as the lack of any authority that places a time limitation for establishing paternity on this previously unidentified father, we find that the juvenile court did not abuse its discretion in granting D.W. a new trial on the issue of legal filiation pursuant to La. C.C.P. art. 1973.

The foster parents next contend that even if the juvenile court correctly allowed the fourth attempt to establish paternity, the proof offered does not give custodial rights to D.W. They contend that the documentation alone regarding paternity was insufficient to establish D.W.'s right to custody and that he should have been required to demonstrate his fitness for parental responsibilities, timely commitment to those responsibilities, concrete actions taken to grasp his opportunity to be a father, and the potential for him to make a valuable contribution to the child's development.

In *In re Adoption of B.G.S.*, 556 So.2d 545, 549-550 (La. 1990), the Louisiana Supreme Court discussed the constitutional liberty interest of a parent having a relationship with his children:

> The interest of a parent in having a relationship with his children is manifestly a liberty interest protected by the Fourteenth Amendment's due process guarantee. The United States Supreme Court has declared it "plain beyond the need for multiple citation" that a biological parent's right to "the companionship, care, custody, and management" of his children is a liberty interest far more important than any property right. *Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); *Lassiter v. Department*

---

[13] Under the Children's Code, "parent" is defined as "any living person who is presumed to be a parent under the Civil Code or a *biological* or adoptive mother or father of a child." La. Ch.C. art. 116(17) (emphasis added).

*of Social Services,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2160, 68 L.Ed.2d 640 (1981). Accordingly, the interest of an unwed father in the children he has sired and raised is entitled to protection under the Due Process Clause. *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Even when the natural father has not lived continuously with his child, he enjoys a similar constitutional protection of his paternal interest when he develops and maintains a substantial relationship with his child by accepting responsibility for the child's future. *Lehr v. Robertson,* 463 U.S. at 262, 103 S.Ct. at 2993–94, 77 L.Ed.2d at 625; cf. *Caban v. Mohammed,* 441 U.S. 380, 389 n. 7, 99 S.Ct. 1760, 1766 n. 7, 60 L.Ed.2d 297, 305 n. 7 (1979).

… Although an unwed father's biological link to his child does not guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. As the Court stated in *Lehr v. Robertson:*

> When an unwed father demonstrates a *full commitment* to the responsibilities of parenthood by "coming forward to participate in the rearing of his child," ... his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his children."....

In the *B.G.S.* case, the court also recognized the significance of the biological connection in that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. *Id.* at 550.

In their appellate brief, the foster parents rely partly on the *B.G.S.* case to support their assertion that D.W., in addition to proving his biological connection, also had to prove his fitness and timely commitment to parental responsibilities to gain custody of his child.[14] We note that the instant case is in a totally different

---

[14] When discussing an unwed father's constitutionally protected interest to develop a relationship with his child, the court stated:

> This interest does not come into existence or is soon lost, however, if the father is unable to demonstrate that he is fit and committed to the responsibilities of parenthood. Moreover, he must show that he has taken concrete actions to grasp his opportunity to be a father and that there is a potential for him to make a valuable contribution to the child's development. Consequently, the mere existence of a biological link and fitness will not

posture and is distinguishable from *B.G.S.*, as well as the other cases relied upon by the foster parents to support their assertion about the father's burden of proving his fitness and timely commitment to his parental responsibilities. In *B.G.S.*, the child's mother had already surrendered the baby for adoption, and the Court was faced with the issue of the constitutionality of a state law that empowered the mother of an illegitimate child to terminate the parental rights of the unwed father without notice and an opportunity to be heard.

The foster parents also cite La. Ch.C. art. 1138 to support their assertion regarding the father's burden of proof in these proceedings. La. Ch.C. art. 1138(A) provides, "At the hearing of the opposition, the alleged or adjudicated father must establish his parental rights by acknowledging that he is the father of the child and by proving that he has manifested a substantial commitment to his parental responsibilities and that he is a fit parent of his child." This burden of proof, however, applies in situations where the alleged or adjudicated father is opposing the adoption of his child in instances where a surrender had been executed or a petition for adoption had been filed. La. Ch.C. art. 1137. In the present case, J.B. had not been surrendered for adoption by the mother and no petition for adoption had been filed. Accordingly, La. Ch.C. art. 1138, which requires the alleged or adjudicated father to establish his parental rights in order to oppose the adoption of his child, is not applicable under the circumstances of this case.

Rather, this is a CINC proceeding governed by Title VI of the Louisiana Children's Code, the purpose of which is to temporarily remove a child from the custody of his parents, if deemed necessary, pending the State's investigation into allegations of abuse and/or neglect, with the ultimate goal of reunification and

---

sustain the father's interest; it is defeasible if not preserved by dedicated, opportune fatherly action.

*In re Adoption of B.G.S.,* 556 So.2d at 550.

return to the parents' custody. Indeed, if reunification is not possible, DCFS "may file a motion for a judicial determination that efforts to reunify the parent and child are not required." La. Ch.C. art. 672.1(A). That article further provides, "The department shall have the burden of demonstrating by clear and convincing evidence that reunification efforts are not required, considering the health and safety of the child and the child's need for permanency." La. Ch.C. art. 672.1(B).

In the present case, no motion was ever filed by DCFS or presented to the juvenile court to suggest that reunification efforts with the father should not be pursued. As discussed in this opinion, D.W., in fact, complied with his case plan, and no efforts were made to terminate his parental rights. Thus, this case never progressed to the point where J.B. was freed for adoption.

In any event, even if D.W. had the burden of proving his fitness and timely commitment to his parental responsibilities, we find that the record establishes his timely commitment to his parental responsibilities as well as concrete actions taken to grasp his opportunity to be a father. In their appellate brief, the former foster parents seems to suggest that D.W.'s delays in submitting the proper documentation to establish his legal right to the custody of J.B. through filiation equate to an untimely commitment to his parental responsibilities and his efforts to establish a relationship with his son and provide for him. Although there were clearly delays in D.W. establishing legal filiation, the record itself and the evidence introduced clearly indicate that during these delays, D.W. was making substantial efforts toward establishing a relationship with J.B. and providing for him.

In particular, the record and evidence introduced at the hearings show that as soon as DCFS advised D.W. that he possibly was the father of J.B.,[15] he engaged in

_____

[15] The foster parents contend that D.W. knew of P.B.'s pregnancy and J.B.'s birth prior to his notification by DCFS. The actual time frame in which he was notified of his possible paternity of J.B. is of no consequence to our ultimate determination in this matter, considering the apparent lack of any time limitations applicable to him for establishing his paternity in light of the posture and circumstances of this case.

DNA testing, proposed a plan for the placement of his son with his sister, and took a parenting course in prison. Further, when he was released from prison, he took steps to begin establishing a relationship with his son and became an active part of his life through regular visitation and through participation in daily activities, such as bringing J.B. to doctors' appointments, therapy appointments, school activities, and family outings. Further, D.W. was approved by ICPC for placement, followed the case plan prepared by DCFS, and obtained housing and employment.

Based on the foregoing, we find no merit to the foster parents' argument that the trial court erred in granting D.W.'s motion for new trial, allowing him a fourth chance to establish legal filiation, but preventing evidence of timeliness, fitness, and other elements necessary to a finding of best interest.[16]

In their second assignment of error, the former foster parents basically complain about the juvenile court's failure to hold a best interest hearing, which they argue this Court ordered in its October 12, 2018 opinion. They assert that the juvenile court made a mistake of law in applying La. Ch.C. art. 682 to a CINC case that was far past disposition and improperly awarding custody to a putative father on the basis of alleged completion of an unapproved, deficient case plan that did not address the child's best interests, safety, or the requirements of La. R.S. 9:364.

---

[16] As part of their argument that D.W. failed to prove his fitness and timely commitment to his parental responsibilities, the foster parents also assert, in their appellate brief, that the juvenile court erred in failing to consider and preventing them from presenting evidence about D.W.'s lack of fitness. The attorney for the foster parents specifically tried to introduce jail phone calls of D.W. in order to impeach his credibility regarding when he actually knew about P.B.'s pregnancy and the birth of J.B. The juvenile court denied her request for admission on the basis that the evidence was not relevant to the determination before the court. The attorney for the foster parents also sought to introduce two domestic abuse convictions of D.W., citing La. R.S. 9:364 as authority for the request. The juvenile court denied her request on the basis that, "This is a 682 hearing concerning removal of a child from parental custody and whether or not he should be reunified because he has met all the safeguards necessary." The juvenile court further stated, "I do think the reason behind the law you're trying to cite is when a mother and father are fighting for custody, not when all parties agree with custody." A trial court has wide discretion concerning the admissibility and relevancy of evidence, and a trial court's ruling will not be disturbed on appeal absent a clear abuse of discretion. *Succession of Olsen*, 19-348 (La. App. 5 Cir. 1/29/20), 290 So.3d 727, 735, *writ denied*, 20-362 (La. 6/3/20), 296 So.3d 1067.

The purpose of CINC proceedings, is "to protect children whose physical or mental health and welfare is substantially at risk of harm … and who may be further threatened by the conduct of others …" Specifically, La. Ch.C. art. 601 states that, "[t]he health, safety, and best interest of the child shall be the paramount concern in all proceedings under this Title."

Despite the foster parents' assertion to the contrary, the juvenile court did, in fact, subsequent to this Court's October 12, 2018 opinion, consider testimony and evidence regarding J.B.'s best interest throughout the entirety of the proceedings.[17] As previously noted in this opinion, on December 11, 2018, Dr. Dickson testified regarding her evaluations of J.B., his aunt, L.W., and J.B.'s former foster parents, J.M. and R.M., and concluded that all three caregivers were very loving and clearly committed to J.B. and that J.B. had an attachment to both his aunt and his former foster parents. However, during her testimony, she was unable to advise the court as to which placement would be in his best interest because J.B. would be loved and cared for in each home. Later in December, Dr. Dickson provided an addendum to her relationship assessment regarding her opinion as to the best interest of J.B. Therein, she stated that J.B.'s "interests would best be served by being allowed to remain with his paternal aunt." In her addendum, Dr. Dickson noted that this placement provided him frequent access to his biological father and other paternal relatives, that J.B. was happy with his father and building a strong relationship with him, and that there was "no good reason" to prevent D.W. from parenting his child.

At the July 17, 2020 hearing, Ms. Luquette testified regarding D.W.'s successful completion of his case plan. She specifically mentioned that D.W. has

---

[17] In its October 30, 2018 order, the juvenile court specifically ordered that all parties be assessed to determine the best interest of J.B. as to placement, which clearly indicates that the juvenile court anticipated that it would be considering J.B.'s best interest when making its further determinations regarding J.B.'s placement and custody.

safe and stable housing; he was approved by Texas ICPC as a relative placement for his child; he is working full-time; he is following his parole conditions; he has never had a positive drug screen; he co-parents J.B. with his sister, L.W.; and he is an active part of J.B.'s life. Ms. Luquette also testified that all of J.B.'s medical, emotional, and developmental needs are being met and that DCFS does not have any concerns for the safety of J.B. should he be reunited with his father.

Further, DCFS submitted numerous reports to the court, which give detailed updates on all aspects of the case, including an overall assessment and recommendation as to the placement that would be in J.B.'s best interest. From our review of the record it is clear that the juvenile court did, in fact, consider the best interest of J.B. in making its determination to award custody to D.W. Upon our review of this case we are unable to say that the juvenile court was manifestly erroneous in its factual determinations regarding D.W.'s efforts at reunification with J.B. or that the juvenile court abused its discretion in awarding custody of J.B. to D.W. after determining that it was in J.B.'s best interest.

We further note that the posture of the proceedings was different at the time of the former foster parents' first appeal. In particular, according to this Court's prior opinion, D.W. had not sufficiently established himself as J.B.'s parent, and therefore, the issue of best interest at that time related to whether J.B. should be placed with the foster parents or J.B.'s biological aunt. Since this Court's first opinion, the circumstances in the proceedings have changed. D.W. has since established his paternity and has complied with the DCFS case plan. Further, the State did not file a petition against D.W. in this CINC proceeding, D.W. has never had custody removed from him, and the CINC case has now been closed. In addition, J.M. and R.M. are no longer J.B.'s foster parents and have not been his foster parents since February 27, 2018. Because of these changes of

circumstances, we find no merit to the foster parents' suggestion that a further best interest hearing is warranted.

**CONCLUSION**

Accordingly, for the reasons set forth herein, we affirm the juvenile court's July 17, 2020 judgment that granted D.W., the biological father of J.B., a new trial on his motion to establish paternity, found D.W. to be the father of J.B., granted D.W. immediate unsupervised custody of J.B., dismissed the motion to intervene filed by J.M. and R.M., and closed the child in need of care proceeding as to J.B.

**<u>AFFIRMED</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MARCH 17, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 20-CA-307

**E-NOTIFIED**

JUVENILE COURT (CLERK)
HON. BARRON C. BURMASTER (DISTRICT JUDGE)
GABRIELLE A. WILSON (APPELLEE)      RACHEL E. HURD (APPELLEE)        SHERRY A. WATTERS (APPELLANT)
LISA P. HARELL (APPELLEE)           JENNIFER G. WOMBLE (APPELLEE)    LACY S. NORRIS (APPELLEE)

**MAILED**

JESSE S. GEORGE (APPELLEE)          MARTA A. SCHNABEL (APPELLANT)
KATHLEEN LEGENDRE (APPELLEE)        ATTORNEY AT LAW
ATTORNEYS AT LAW                    935 GRAVIER STREET
935 GRAVIER STREET                  SUITE 900
SUITE 1340                          NEW ORLEANS, LA 70112
NEW ORLEANS, LA 70112